## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) ) ) | |
| | ) | |
| **Counterclaimants,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:08-CV-00585-RMC** |
| | ) | |
| | ) | |
| **TILLOTSON CORPORATION,** | ) | |
| | ) | |
| **Counterclaim Defendant.** | ) | |
| | ) | |

## TILLOTSON CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR IMPROPER VENUE, OR IN THE ALTERNATIVE TO TRANSFER

### Introduction

Ansell has provided no basis for denying Tillotson's motion to dismiss. The improper-venue defense was unavailable to Tillotson until after Tillotson's motion for more definite statement prompted Ansell to file its Amended Counterclaim; Tillotson could not have waived that defense before then. Because Ansell has adduced no facts suggesting that the ITC proceeding has directly given rise to Ansell's Counterclaim, venue is improper in this Court. Finally, if venue is proper anywhere, it is proper in the District of Delaware or the Northern District of Georgia, where previously filed lawsuits involve many, if not all, of the same issues that Ansell raises here. The Court should therefore dismiss Ansell's Counterclaim, or in the alternative transfer it to one of the fora that Tillotson proposes.

### Argument

**I.    Tillotson Has Not Waived Its Right to Challenge Venue.**

    A.    A Defendant Cannot Waive a Defense Unavailable to It at the Time.

The Federal Rules of Civil Procedure prohibit filing a second Rule 12 motion "raising a defense or objection *that was available to the party* but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2) (emphasis added).  As the cases cited by Ansell describe, defendants must file motions to dismiss with the first responsive pleading if the facts supporting those motions are either alleged in the Complaint or available to the defendant immediately.  See, e.g., Martin v. Delaware Law School of Widener University, 625 F. Supp. 1288, 1296 (D. Del. 1985).  See also, Dehaemers v. Wynne, 522 F. Supp. 2d 240, 245 (D.D.C. 2007).

Defendants do not, however, waive defenses that are "available … but omitted" from the initial pleading.  See Fed. R. Civ. P. 12(h); Candido v. District of Columbia, 242 F.R.D. 151, 161 (D.D.C. 2007) (considering motion to dismiss because no waiver where defense of insufficient service not "then available"); Flock v. Scripto-Tokai Corp., No. H-00-3794, 2001 U.S. Dist. LEXIS 23881, *9 (S.D. Tex. June 25, 2001) (considering motion to dismiss filed after answer) (Exh. H); Glater v. Eli Lilly & Co., 712 F.2d 735, 738 (1st Cir. 1983) (district court properly considered motion to dismiss for lack of personal jurisdiction after answer).

Because motions for a more definite statement often signal that other defenses are currently unavailable, such motions do not create waiver under Rule 12(h).  Printing Plate Supply Co. v. Curtis Publishing Co., 278 F. Supp. 642, 644 (E.D. Pa. 1968) (considering motion to dismiss filed after motion for more definite statement "because logically other Rule 12 motions cannot be raised until the movant knows what the claims against him are.")  For this reason courts often advise that where a defendant cannot respond to a complaint, he should move for a more definite statement first, and for dismissal later.  See Hilska v. Jones, 217 F.R.D. 16 (D.D.C. 2003) ("when a defendant is unclear about the meaning of a particular allegation in the complaint, the proper course of action is not to move to dismiss but to move for a more definite

statement"); <u>Rizzo v. Ammond</u>, 182 F. Supp 456, 469 (D.N.J. 1960) (granting motion to dismiss and finding no waiver because complaint "justified the defendants in seeking a more definite statement before determining the defenses which they would raise or upon other appropriate action which they might take against the claims so clarified.").

      B.     The Improper Venue Defense was Not Available to Tillotson at the Time it <u>Moved for a More Definite Statement.</u>

Ansell's initial Counterclaim alleged that Tillotson has:

- "had a pattern of filing district court lawsuits" alleging infringement in bad faith -- but not saying where;

- "also directly asserted counterclaims of infringement .. in declaratory judgment actions" -- but not saying where;

- "publicized its litigations … to induce customers not to purchase gloves from its competitors" like Ansell -- but not saying which customers were affected, which lawsuits Tillotson supposedly publicized or where the publicity took place; and

- "caused at least one of Ansell Healthcare's suppliers [unnecessarily] to enter into a license" -- but not saying which supplier.

Complaint, ¶¶ 10, 11, 13, 15.  Because Tillotson believed it had a number of defenses and bases for dismissal that depended on which law governed Ansell's claims, and Ansell had not alleged facts sufficient to determine the choice of law, Tillotson moved for a more definite statement. Motion for More Definite Statement ("Rule 12(e) Motion") at 1 (filed April 23, 2008) (describing difficulty of determining "what bases for a Rule 12 motion are available" to Tillotson).

      The uncertainties that clouded the choice-of-law issue also inhibited Tillotson's ability to determine the proper venue.  The choice of law, for example, depends in part on "where the conduct causing the injury occurred."  <u>Drs. Goover, Christie & Merritt v. Burke</u>, 917 A.2d 1110, 1117 (D.C. 2007).  Venue for Ansell's claims depends on a closely related question:  where a "substantial part" of the events "giving rise to the claim occurred."  28 U.S.C. § 391(a)(2).

Tillotson's inability to determine the choice of law thus also kept it from determining the proper venue.

Ansell did not oppose Tillotson's motion for more definite statement.  Instead, Ansell amended its Counterclaim, this time alleging where the "pattern of filing district court lawsuits" had occurred, where Ansell had brought its counterclaims and where Tillotson had allegedly publicized "some of its litigations."  Amended Counterclaim (filed April 28, 2008), ¶¶ 10-12, 15. Significantly, given its additional allegation that its claims "arise under the laws of the District of Columbia," *id*., ¶ 17, Ansell did not allege the loss of any sales, any customers, any contracts, any prospective contracts, or any suppliers in Washington, DC.

What Ansell said in its Amended Counterclaim -- and what it did not say -- also gave Tillotson the basis to raise an improper-venue defense.  For the first time, Ansell's Amended Counterclaim identified that the "substantial part" of the events "giving rise to [its] claims" occurred outside Washington, DC:  in Georgia, in Delaware and in other unidentified locations. Because Tillotson's venue defense was unavailable until Ansell amended its Counterclaim, Tillotson's earlier motion did not waive the later-developed defense.  See Flock, 2001 U.S. Dist. LEXIS 23881 at *9.

## II.    Nothing Suggests that a Substantial Part of the Events Giving Rise to Ansell's Claims Occurred in the District of Columbia.

Ansell must establish that a "substantial part of the events…giving rise to the claim" occurred in this district.  28 U.S.C. § 1391(a)(2); see also Michilin Prosperity Co. LTD v. Dudas, No. 06-1471, 2007 U.S. Dist. LEXIS 55216, at *2 (D.D.C. July 31, 2007) (Exh. I).  In trying to meet that burden, Ansell focuses the Court on different issues:  whether a substantial part of the events *alleged in its counterclaim* occurred here, or whether Ansell has been injured by events occurring here.  Ansell thus describes its allegations of "tortious acts in this and other districts,"

and its injury from "defending against Tillotson's knowing pursuit of invalid and unenforceable claims" brought here.  Opposition to Motion to Dismiss ("Opposition") at 9-10.

Venue depends, however, on a different issue:  where a "substantial part of the events or omissions *giving rise to the claim occurred*."  28 U.S.C. § 1391(a)(2).  No matter how substantial an alleged event may be as an independent matter, it must directly give rise to the Ansell's claim to determine venue.  Abramoff v. Shake Consulting, LLC, 288 F. Supp. 2d 1, 5 (D.D.C. 2003) (concluding venue improper because the "substantial part" of the events alleged in the District of Columbia did not directly give rise to plaintiff's claim); Woodke v. Dahm, 70 F.3d 983, 985 (8th Cir. 1995) (affirming dismissal of case for improper venue because manufacture of product, although necessary event to infringement, did not constitute a substantial part of events giving rise to the claim).

Ansell sues Tillotson for unfair competition and tortious interference with contract or prospective business advantage.  Amended Counterclaim, ¶¶ 18-25.  The Court has before it no evidence that the only act occurring in this jurisdiction -- the filing of an allegedly bad-faith ITC action -- directly gave rise to these claims.  Ansell does not allege that Tillotson publicized the ITC action.  Ansell does not allege that potential customers declined to buy nitrile gloves from it because of the ITC action, as opposed to earlier-filed district court lawsuits.[1]  The only harm that Ansell *has* alleged directly from the ITC proceeding -- the cost of defending it -- lies outside the

---

[1] District court actions, of course, create much greater incentives among potential customers not to buy the allegedly infringing products.  Purchasers of such products risk being named as a defendant in district court infringement actions, because a purchase can constitute an act of infringement.  See 35 U.S.C. § 271(g) ("[w]hoever without authority imports into the United States or offers to sell, sells, or **uses** within the United States a product which is made by a process patented in the United States shall be liable as an infringer.")  Purchasers of already imported products cannot, however, be named in ITC proceedings.  See 19 U.S.C. § 1337(d)(1) ("If the Commission determines…a violation of this section, it shall direct that the articles concerned, imported by any person violation the provision of this section, be excluded from entry into the United States.").

remedies offered by the claims it asserts here.  See, e.g., Gov't Rels. Inc. v. Howe, 2007 U.S.

Dist. LEXIS 4952, *31 (D.D.C. Jan. 24, 2007) (granting motion to dismiss tortious interference

with contract claim for failing to allege any actual loss of clients) (Exh. J).  Nothing alleged in

the Amended Counterclaim or adduced in Ansell's Opposition suggests that the ITC action

"gives rise to" the claims that Ansell asserts.

**III.    Venue Under 28 U.S.C. §1391(a)(1) Was Not Asserted in the Counterclaim.**

Ansell's Opposition asserts a second basis for venue, one that it claims Tillotson has

"completely ignore[d]," and failed to challenge "in *either* of its Rule 12 motions."  Opposition at

12 (emphasis in original).  Tillotson's supposed concession of personal jurisdiction, according to

Ansell, precludes further challenge to Ansell's other basis for personal jurisdiction:  28 U.S.C.

§ 1391(a)(1).

Ansell, however, has never alleged this statute as the basis for venue in this Court.  Both

of its Counterclaims allege only 13 U.S.C. § 1391(a)(2).  Amended Counterclaim, ¶ 7;

Counterclaim, ¶ 7.  Because Tillotson could not have waived a challenge to a venue assertion

that Ansell has never made, the Court should not consider Ansell's argument on this point.

**IV.    Transfer to One of the Currently Pending Cases Involving these Issues is Appropriate.**

If this Court does not dismiss Ansell's counterclaim, Tillotson, at a minimum, has

established that transfer is appropriate because a substantial part of the events *giving rise to*

*Ansell's claims* did *not* occur in the District of Columbia.  Abramoff, 288 F. Supp. 2d at 5.  The

"convenience of the parties" and "the interest of justice" both require transfer -- either to the

Northern District of Georgia or to the District of Delaware, where almost two years ago Ansell

filed its declaratory judgment action against Tillotson raising the same issues.  See Ansell

counterclaimant's Delaware Complaints (Exh. K); 28 U.S.C. § 1404(a).

This counterclaim is the second litigation the Ansell counterclaimants have filed against Tillotson in two different jurisdictions -- Delaware and the District of Columbia.  Ansell's Delaware and District of Columbia actions, and Tillotson's Georgia action, arise from the same nucleus of facts, involve the same witnesses, and would use the same documents or sources of proof.  Litigating those issues in two or three different for a offers no benefit in convenience to the parties, in efficiency and in time- or cost-savings.  Moreover, the only tie to this jurisdiction -- the ITC hearing -- grows weaker with each passing day, since the hearing in that proceeding concluded on May 30, 2008.  The Court should therefore transfer this case.

## CONCLUSION

For the foregoing reasons, Tillotson's Motion to Dismiss for Improper Venue should be granted and this case dismissed for improper venue.  Alternatively, the case should be transferred to the Northern District of Georgia or the District of Delaware for reasons of efficiency and judicial economy.

Tillotson believes that oral argument is unnecessary on its Motion, and opposes Ansell's request under L. Civ. R. 78.1.

Respectfully submitted this 6th day of June, 2008.


/s/   Brian Meiners
Brian Meiners
Washington D.C. Bar No. 482039

KING & SPALDING LLP

1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-2706
(202) 737-0500 (telephone)
(202) 626-3737 (facsimile)

Attorney for Tillotson Corporation

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) ) ) | |
| | ) | |
| **Counterclaimants,** | ) | |
| | ) | |
| v. | ) | **CASE NO. 1:08-CV-00585-RMC** |
| | ) | |
| | ) | |
| **TILLOTSON CORPORATION,** | ) | |
| | ) | |
| **Counterclaim Defendant.** | ) | |
| _____ | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion to Dismiss for Improper Venue or in the Alternative to Transfer, and accompanying Brief in Support of the Motion, were served on Counsel of Record via Court's CM/ECF Electronic Filing.

/s/   Brian Meiners
Brian Meiners
Washington D.C. Bar No. 482039

KING & SPALDING LLP

1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-2706
(202) 737-0500 (telephone)
(202) 626-3737 (facsimile)

Attorney for Tillotson Corporation

# EXHIBIT H

LEXSEE 2001 U.S. DIST. LEXIS 23881

**BRYAN FLOCK, Individually, and as Next Friend, Natural Father, and as Heir of his Son, Brandon Flock (deceased), OMY RAY MUNSINGER, Individually, and as Natural Father, and as an Heir of Shonda Munsinger (deceased), PATRICIA MUNSINGER HARRIS, Individually, and as Natural Mother, and as an Heir of Shonda Munsinger (deceased) and MICKEY BRITT, Plaintiffs, versus SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, JMP MEXICO, S.A. de C.V. and TOKAI DE MEXICO, S.A. de C.V., Defendants.**

CIVIL ACTION H-00-3794

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

*2001 U.S. Dist. LEXIS 23881*

**June 25, 2001, Decided
June 26, 2001, Entered**

**SUBSEQUENT HISTORY:** Adopted, motion denied, *Flock v. Scripto-Tokai Corp., 2001 U.S. Dist. LEXIS 23880 (S.D. Tex. July 20, 2001).*

**DISPOSITION:**    [*1] Magistrate recommends that this Defendants' motion to dismiss be denied.

**COUNSEL:** For BRYAN FLOCK, OMY RAY MUNSINGER, PATRICIA MUNSINGER HARRIS, MICKEY BRITT, plaintiffs: Barbara Radnofsky, Vinson & Elkins, Houston, TX.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, JMP MEXICO SA DE CV, TOKAI DE MEXICO SA DE CV, defendants: David M Prichard, Prichard Hawkins et al, San Antonio, TX.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, JMP MEXICO SA DE CV, TOKAI DE MEXICO SA DE CV, defendants: Mark K Suzumoto, VanEtten Suzumoto et al, Santa Monica, CA.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, third-party plaintiffs: David M Prichard, Prichard Hawkins et al, San Antonio, TX.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, third-party plaintiffs: Mark K Suzumoto, VanEtten Suzumoto et al, Santa Monica, CA.

For KENNETH KEITH MANN, third-party defendant: Jimmy Dean Johnson, Johnson and Associates, Houston, TX.

For MICKEY BRITT, third-party defendant: Barbara Radnofsky, Vinson & Elkins, Houston, TX.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, counter-claimants: David M Prichard, Prichard Hawkins et al, San Antonio, [*2] TX.

For SCRIPTO-TOKAI CORPORATION, TOKAI CORPORATION, counter-claimants: Mark K Suzumoto, VanEtten Suzumoto et al, Santa Monica, CA.

For MICKEY BRITT, counter-defendant: Barbara Radnofsky, Vinson & Elkins, Houston, TX.

**JUDGES:** Marcia A. Crone, United States Magistrate Judge.

**OPINION BY:** Marcia A. Crone

**OPINION**

**MEMORANDUM AND RECOMMENDATION**

Pending before the court is Defendants Tokai Corporation, JMP Mexico, S.A. de C.V., and Tokai de Mexico, S.A. de C.V.'s Motion to Dismiss for Insufficient/Untimely Service of Process (# 31). Tokai Corporation is a Japanese corporation headquartered in Tokyo, Japan. JMP Mexico, S.A. de C.V. is a Mexican corpora-

tion with its principal place of business located in Tijuana, Mexico, while Tokai de Mexico, S.A. de C.V. is a Mexican corporation based in Cuernavaca, Mexico. Tokai Corporation, JMP Mexico, and Tokai de Mexico seek dismissal of Plaintiffs' claims due to insufficient and untimely service of process under *Rules 12(b)(5)* and *4(m) of the Federal Rules of Civil Procedure*. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court recommends that the motion to dismiss be denied.

## 1. [*3] Background

Brandon Flock and his mother, Shonda Munsinger, were residents of Montgomery County, Texas. According to Plaintiffs, on October 16, 1999, four-year-old Brandon used a product known as the Aim 'N Flame lighter to start a fire, which caused his death along with that of his mother. The product was discovered on the floor of the residence by the Montgomery County Fire Department. Plaintiffs allege that the Aim 'N Flame lighter was designed, manufactured, advertised, and placed in the stream of commerce in the State of Texas by Defendants Scripto-Tokai, Tokai Corporation, JMP Mexico, and Tokai de Mexico.

Based on these facts, Plaintiffs filed their Original Complaint on October 30, 2000, asserting claims against Scripto-Tokai, Tokai Corporation, JMP Mexico, and Tokai de Mexico based on the *Restatement (Third) of Torts: Products Liability sections 1-4* and *11*, the *Restatement (Second) of Torts section 402B*, the Texas Deceptive Trade Practices Act, wrongful death and survival under *Section 71.004 of the Texas Civil Practice and Remedies Code*, strict liability, breach of express and implied warranties, negligence, gross negligence, negligence *per se*, and *15 U.S.C. § 2072* [*4] for violation of 16 C.F.R. Part 1210. Although Scripto-Tokai waived service of process on November 15, 2000, the remaining defendants have declined to waive service. Plaintiffs' efforts to serve the foreign corporations have been unsuccessful to date. Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico move to dismiss Plaintiffs' claims against them for insufficient/untimely service of process. Alternatively, Defendants seek protection from responding to pending discovery requests until they have been served or at least be given a reasonable time from the date of the court's order denying the motion to dismiss to respond to the requested discovery.

## 2. Analysis

### A. Dismissal under *Rules 12(b)(5)* and *4(m)*

Defendants argue in their motion to dismiss that Plaintiffs were required to serve the foreign corporations pursuant to the Hague Convention and the Inter-American Convention on Letters Rogatory. Defendants

contend that the court confirmed this requirement at a status conference on January 18, 2001, when counsel were advised to serve the foreign entities through the appropriate channels. Tokai Corporation, JMP Mexico, and Tokai de Mexico now move under *Rule 12(b)(5)* [*5] *of the Federal Rules of Civil Procedure* to dismiss Plaintiffs' claims for failure to serve them within the time frame mandated by *Rule 4(m)* and, alternatively, seek protection from the discovery requests that were forwarded to them on February 12, 2001, and March 8, 2001. Defendants' motion to dismiss for insufficient/untimely service of process focuses on the requirement of *Rule 4(m)* that service of a summons and complaint be made upon a defendant within 120 days after the filing of the complaint. Because the complaint was filed on October 30, 2000, Defendants contend that Plaintiffs had until February 27, 2001, to effect service and that their failure to do so requires the court to dismiss the action. *Rule 4(m)*, however, permits the court to dismiss the action without prejudice or to direct that service be effected within a specified time period. It provides:

> **(m) Time Limit for Service.** If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service [*6] be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).

*FED. R. CIV. P. 4(m)*.

### B. Waiver of Service

In response, Plaintiffs argue that Defendants have waived service by making a general appearance before the court. Plaintiffs point out that at the scheduling conference on January 18, 2001, all four defendants presented an agreed motion, signed by counsel of record, David M. Prichard, requesting that their in-house counsel, Mark Suzumoto, be admitted *pro hac vice*. Appended to the motion is Prichard's sworn verification stating that he is an attorney for the foreign defendants as well as for Scripto-Tokai. Plaintiffs maintain that foreign

Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico have effectively waived service by their general appearance before the court through their counsel's submission of the motion for *pro hace vice* admission of Suzumoto, rendering formal service unnecessary.

*Rule 12(h)(1) of the Federal Rules of Civil Procedure* [*7] requires that objections to service of process be raised in a party's first responsive pleading or by motion filed prior to the responsive pleading. *See United States v. 51 Pieces of Real Property, 17 F.3d 1306, 1314 (10th Cir. 1994); Pusey v. Dallas Corp., 938 F.2d 498, 501 (4th Cir. 1991); Glater v. Eli Lilly & Co., 712 F.2d 735, 738 (1st Cir. 1983); Golden v. Cox Furniture Mfg. Co., 683 F.2d 115, 118 (5th Cir. 1982); T & R Enters., Inc. v. Continental Grain Co., 613 F.2d 1272, 1276 (5th Cir. 1980). Rule 12(h)(1)* provides:

### (h) Waiver or Preservation of Certain Defenses.

(1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

*FED. R. CIV. P. 12(h).* "It is clear under this rule that defendants wishing to raise any of these four defenses [*8] must do so in their first defensive move, be it a *Rule 12* motion or a responsive pleading." *Glater, 712 F.2d at 738; accord Golden, 683 F.2d at 118* (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1391, at 855 (1969)); *T & R Enters., Inc., 613 F.2d at 1277.* If a party files a pre-answer motion and fails to assert the defense of insufficiency of service, he waives that defense. *See 51 Pieces of Real Property, 17 F.3d at 1314; Pusey, 938 F.2d at 501; Golden, 683 F.2d at 118; T & R Enters., Inc., 613 F.2d at 1277.* A defendant's unexcused failure to raise the untimeliness of service defense by motion or answer deprives the court of the power to dismiss the case because a waiver of this defense constitutes a submission to the jurisdiction of the court. *See Pusey, 938 F.2d at 501.*

Waiver occurs, however, only as to defenses available at the time the motion or answer was filed. *See id.; Glater, 712 F.2d at 738.* "By failing to raise the defense that service of process was untimely . . . either in a pre-answer motion or, [*9] if no such motion is made, then in its answer, a defendant waives that defense and submits to the personal jurisdiction of the court under *FED. R. CIV. P. 12(h)(1)(B), unless at the time of service of the answer the defendant did not know that the defense was available." Pusey, 938 F.2d at 501* (emphasis added). "*Rule 12(g)* operates in conjunction with *Rule 12(h)* to require that all defenses permitted to be raised by motion must be included in the same motion. This requirement, however, extends only to defenses 'then available.'" *Glater, 712 F.2d at 738* (citing *FED. R. CIV. P. 12(g)).* A defendant "could not waive a defense involving facts of which it was not, and could not have been expected to have been, aware." *Id.* (citing 5 C. WRIGHT & A. MILLER, *supra,* § 1391, at 853-54). In this instance, Defendants did not waive their insufficient/untimely service of process defense by submitting their motion for *pro hac vice* admission of Suzumoto on January 18, 2001, because, at that time, 120 days had not elapsed after the filing of the complaint on October 30, 2000. Thus, such a defense was not "then available." *See FED. R. CIV. P. 12(g).*

[*10] Furthermore, "Defendants' counsels' filing of initial appearances or motions for admission *pro hac vice* are not the defensive moves in which a waiver of personal jurisdiction can occur." *Springer v. Balough, 96 F. Supp. 2d 1250, 1256 (N.D. Okla.), aff'd, 232 F.3d 902 (10th Cir. 2000); see 51 Pieces of Real Property, 17 F.3d at 1314; Martinez v. Picker Int'l, Inc., 635 F. Supp. 658, 659 (D.P.R. 1986).* Like the motion for extension of time at issue in *Martinez,* none of the cases cited by Plaintiffs supports the proposition that the filing of a motion to appear *pro hac vice* "constitute[s] a 'defensive move' requiring incorporation of the *Rule 12 . . .* defective service of process defenses so as to preserve them." *Id.* Two of the cases are inapposite because they are based on Texas procedure, which unlike federal procedure, still recognizes a distinction between general and special appearances. *See Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1340 (5th Cir. 1996); Tisdale v. Georgia-Pacific Corp., 854 F.2d 773, 776 (5th Cir. 1988).* "Whether there has been a waiver [*11] of the well-founded objection to service of process . . . is to be decided by federal rules." *Golden, 683 F.2d at 118* (citing *Wright v. Yackley, 459 F.2d 287, 291 n.9 (9th Cir. 1972); Neifeld v. Steinberg, 438 F.2d 423, 426 (3d Cir. 1971);* 5 C. WRIGHT & A. MILLER, *supra,* § 1343, at 853-54). In fact, the purpose behind *Rule 12* "was to dispense with the technicality of making special appearances to challenge jurisdiction or risk submission." *Martinez, 635 F. Supp. at 659.* As the Third Circuit explained more than fifty years ago:

*Rule 12* has abolished for the federal courts the age-old distinction between general and special appearances. A defendant need no longer appear specially to at-

tack the court's jurisdiction over him. He is no longer required at the door of the federal courthouse to intone that ancient abracadabra of the law, *de bene esse*, in order by its magic power to enable himself to remain outside even while he steps within.

*Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 874 (3d Cir.), cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944).* [*12]

In the third case relied upon by Plaintiffs, the Fifth Circuit held that the defendant corporation contesting service had waived its right to object because it had "voluntarily appeared, pleaded, and participated in the case without first asserting the defect in service of process." *Golden, 683 F.2d at 118.* A review of the decision reveals that the defendant in question waited more than three years to contest service and did so only after filing an answer, an amended answer, and a motion to transfer venue and attending depositions. *See id. at 118-19.* In the pending case, the motion presented by Defendants requesting that Suzumoto be admitted *pro hac vice* differs from situations where defendants contesting service actively defend the action, request affirmative relief, or participate in discovery.

The admission of non-local attorneys *pro hac vice* is a long-standing tradition in both federal and state courts. *See Reese v. Peters, 926 F.2d 668, 669-70 (7th Cir. 1991).* "Typically, admission *pro hac vice* is a formality, so long as the courts of some jurisdiction have approved the attorney as having the requisite skill and integrity [*13] to practice law." *Cole v. United States, 162 F.3d 957, 958 (7th Cir. 1998).* For purposes of admission to practice in federal court, admission to a state bar is the basic determinant of both professional and ethical qualifications. *See Sanders v. Russell, 401 F.2d 241, 247 (5th Cir. 1968).* "Admission to a state bar creates a presumption of good moral character that cannot be overcome merely by the whims of the District Court." *In re Evans, 524 F.2d 1004, 1007 (5th Cir. 1975).* The motion submitted to the court requesting that Suzumoto be admitted *pro hac vice* cannot be construed as an affirmative action that impliedly recognizes this court's jurisdiction over the foreign defendants. Therefore, under these circumstances, Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico have not waived service of process.

C. Time Limit for Service

Plaintiffs argue that Defendants' refusal to waive service of process has caused delays of approximately one year, characterizing Defendants' efforts to obtain dismissal of the foreign entities as mere "trial strategy."

*Rule 4(m) of the Federal Rules of Civil Procedure* requires service [*14] of process on domestic defendants within 120 days after the filing of the complaint. The 120-day deadline for serving the summons and complaint upon defendants does not apply to service in foreign countries. In fact, *Rule 4(m)* specifically states, "This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1)." *FED. R. CIV. P. 4(m).* Subdivision (f) of *Rule 4* specifies the method of service of individuals in foreign countries, while subdivision (j)(1) of *Rule 4* specifies the manner of service upon foreign states or political subdivisions, agencies, or instrumentalities.

Defendants argue that service upon a foreign corporation is addressed by *Rule 4(h),* and because *Rule 4(h)* is not mentioned in *Rule 4(m),* a foreign corporation is not exempt from the 120-day service requirement. With respect to service outside the United States, however, *Rule 4(h)(2)* explicitly incorporates the methods of service prescribed in *Rule 4(f).* "*Rule 4(h)(2)* directs litigants to follow *Rule 4(f)* when serving a corporation or association." *Pennsylvania Orthopedic Ass'n v. Mercedes-Benz A.G., 160 F.R.D. 58, 59 n.1 (E.D. Pa. 1995).*

The courts have consistently [*15] recognized that the 120-day time limit does not apply to service in foreign countries of individual or corporate defendants. *See, e.g., Lucas v. Natoli, 936 F.2d 432, 433 (9th Cir. 1991), cert. denied, 502 U.S. 1073 (1992); Kim v. Frank Mohn A/S, 909 F. Supp. 474, 479-80 (S.D. Tex. 1995); Pennsylvania Orthopedic Ass'n, 160 F.R.D. at 59-60; Cargill Ferrous Int'l v. M/V Elikon, 154 F.R.D. 193, 195-96 (N.D. Ill. 1994); Loral Fairchild Corp. v. Matsushita Elec. Indus. Co., Ltd., 805 F. Supp. 3, 4-5 (E.D.N.Y. 1992); see also James v. Rutil (S.R.L.), 1997 U.S. Dist. LEXIS 4029, No. IP 95-530- C-B/S, 1997 WL 151174, at *5 (S.D. Ind. Mar. 14, 1997); Riendeau v. St. Lawrence & Atl. R. R. Co., 167 F.R.D. 26, 28 (D. Vt. 1996).* "It would be unduly harsh to require plaintiffs to meet the 120 day requirement when serving a foreign defendant." *Loral Fairchild Corp., 805 F. Supp. at 5.* "The exclusion of service in a foreign country from the 120 day limit is reasonable, and helps to counterbalance the complex and time-consuming nature of foreign service of process." *Kim, 909 F. Supp. at 480.* [*16] "This laxity is apparently to compensate for 'the fact that foreign service of process can be very complex and time consuming.'" *Pennsylvania Orthopedic Ass'n, 160 F.R.D. at 61* (quoting *Loral Fairchild Corp., 805 F. Supp. at 5*). Thus, because Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico are all residents of foreign countries, it was not necessary for Plaintiffs to effect service of process on them within 120 days after filing the complaint.

If the 120-day time limit did apply, *Rule 4(m)* requires the court to extend the period upon a showing of

good cause. *See Carimi v. Royal Carribean Cruise Line, Inc., 959 F.2d 1344, 1348-49 (5th Cir. 1992); Riendeau, 167 F.R.D. at 28; Kim, 909 F. Supp. at 480 n.5.* Indeed, "the majority of circuits . . . have found that the plain language of *rule 4(m)* broadens a district court's discretion by allowing it to extend the time for service even when a plaintiff fails to show good cause." *Thompson v. Brown, 91 F.3d 20, 21 (5th Cir. 1996); see Espinoza v. United States, 52 F.3d 838, 840 (10th Cir. 1995); Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1305 (3d Cir. 1995);* [*17] *see also Riendeau, 167 F.R.D. at 28; Cargill Ferrous Int'l, 154 F.R.D. at 195.* Here, although the 120-day period is inapplicable, Plaintiffs have nevertheless demonstrated good cause for extending the time to effect service.

Moreover, because service of process is not subject to the 120-day limit of *Rule 4*, dismissal of the case at this juncture would be inappropriate. In a comparable situation, United States District Judge Samuel Kent of this court, upon rejecting the defendant's motion to dismiss, ordered the plaintiff to forward a letter of request for service to the proper authority in accordance with the Hague Convention within sixty days. *See Kim, 909 F. Supp. at 480.* The order further provided that if service could not be effected within 180 days after a proper request was submitted, the parties were to notify the court to permit an alternative means of service, as provided in *Rule 4(f)(3) of the Federal Rules of Civil Procedure. See id.* A similar procedure appears to be suitable in this case.

D. Discovery Requests

Alternatively, Defendants seek to avoid responding to interrogatories, requests for production, and [*18] requests for admissions propounded by Plaintiffs until they have been served or at least to be given a reasonable time after the court's denial of the motion to dismiss to respond to the requested discovery. Defendants correctly note that interrogatories and requests for admissions may only be directed to parties, not to defendants that have never been served with process. *See United States v. Lot 41, Berryhill Farm Estates, 128 F.3d 1386, 1397 (10th Cir. 1997); University of Tex. at Austin v. Vratil, 96 F.3d 1337, 1340 (10th Cir. 1996); Venezia v. Robinson, 16 F.3d 209, 212 (7th Cir.), cert. denied, 513 U.S. 815, 130 L. Ed. 2d 26, 115 S. Ct. 71 (1994); see also FED. R. CIV.*

*P. 33, 36.* Under *Rule 34(c)*, however, non-served defendants and other persons who are not parties to the action may be compelled to produce documents and things or submit to an inspection in response to a valid subpoena as provided in *Rule 45. See Natural Gas Pipeline Co. v. Energy Gathering, Inc., 2 F.3d 1397, 1406 (5th Cir. 1993), cert. denied, 510 U.S. 1073, 127 L. Ed. 2d 77, 114 S. Ct. 882 (1994); see also* [*19] *FED. R. CIV. P. 34, 45.* In this instance, Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico should not be required to respond to interrogatories, requests for production, or requests for admissions in the absence of service of process or a properly issued subpoena.

3. Conclusion

Accordingly, this court recommends that Defendants' motion to dismiss for insufficient/untimely service of process be denied, requiring Plaintiffs to serve Defendants Tokai Corporation, JMP Mexico, and Tokai de Mexico within ninety days of the court's order. This court further recommends that Defendants be permitted to refrain from responding to the pending interrogatories, requests for production, and requests for admissions until thirty days after service of process. If service of process cannot be effected within ninety days of the court's order, Plaintiffs shall notify the court, and an alternative means of service may be provided as contemplated by *Rule 4(f)(3).*

The Clerk shall send copies of the Memorandum and Recommendation to the respective parties. The parties have ten days from receipt to file specific, written objections to the Memorandum and Recommendation. [*20] *See FED. R. CIV. P. 72.* Absent plain error, the failure to file objections bars an attack on the factual findings, as well as the legal conclusions, on appeal. The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208-1010. Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208-0070.

SIGNED at Houston, Texas, this 25th day of June, 2001.

Marcia A. Crone

United States Magistrate Judge

# EXHIBIT I

LEXSEE 2007 U.S. DIST. LEXIS 55216

**MICHILIN PROSPERITY CO., LTD., Plaintiff, v. JON W. DUDAS, Defendant.**

**Civil Action No. 06-1471 (RWR)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2007 U.S. Dist. LEXIS 55216*

**July 31, 2007, Decided**
**July 31, 2007, Filed**

**COUNSEL:** [*1] For MICHILIN PROPSERITY CO., LTD., Plaintiff: Felix Joseph D'Ambrosio, LEAD ATTORNEY, Thomas J. Moore, BACON & THOMAS, PLLC, Alexandria, VA.

For Jon Dudas, Under Secretary of Commerce for Intellectual Property and director of the U.S. Patent and Trademark Office, Defendant: Marian L. Borum, U.S. ATTORNEY'S OFFICE, Washington, DC.

**JUDGES:** RICHARD W. ROBERTS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RICHARD W. ROBERTS

**OPINION**

### *MEMORANDUM OPINION AND ORDER*

Plaintiff Michilin Prosperity Co., Ltd. ("Michilin") brings this patent suit against defendant Jon W. Dudas, Director of the United States Patent and Trademark Office ("USPTO"), seeking judicial review of Dudas's denial of Michilin's request for a certificate of correction under *37 C.F.R. § 1.322* to correct an alleged error in Michilin's patent. Asserting that venue is improper in the District of Columbia ("the District"), Dudas moves to dismiss the case, or to transfer the action to the United States District Court for the Eastern District of Virginia. Because the District lacks venue over this matter, and it is in the interest of justice to transfer to an appropriate forum rather than dismiss the case entirely, the motion to transfer will be granted.

### *BACKGROUND*

Michilin, [*2] a Taiwanese corporation, owns *U.S. Patent No. 6,550,701 ("'701 patent")*. Michilin asked the USPTO to correct an error in its *'701 patent*. After the USPTO denied Michilin's request, Michilin appealed to Dudas. Dudas denied Michilin's appeal and Michilin now seeks judicial review of this denial.

Dudas moves under *Federal Rule of Civil Procedure 12(b)(3)* to dismiss, or to transfer under *28 U.S.C. § 1406(a)*, arguing that venue is improper in the District because Dudas, as director of the USPTO, resides in Virginia, and the events or omissions giving rise to Michilin's claim occurred in Virginia. Michilin claims that venue is proper here because the *'701 patent* is situated in the District and Dudas, as Undersecretary of Commerce for Intellectual Property, resides in the District.

### *DISCUSSION*

*Rule 12(b)(3)* allows a case to be dismissed for improper venue. *See Fed. R. Civ. P. 12(b)(3)*. "[T]he plaintiff bears the burden of establishing that venue is proper." *Varma v. Gutierrez, 421 F. Supp. 2d 110, 113 (D.D.C. 2006)* (internal quotations omitted). "In considering a *Rule 12(b)(3)* motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable [*3] inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Darby v. United States DOE, 231 F. Supp. 2d 274, 276 (D.D.C. 2002)*. A court need not accept the plaintiff's legal conclusions as true; however, to prevail on a motion to dismiss for improper venue, a defendant must present facts sufficient to defeat a plaintiff's assertion of venue. *Id. at 277*.

In suits brought against an "officer or employee of the United States or any agency thereof acting in his official capacity," venue is properly laid in "any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action." *28 U.S.C. § 1391(e)*. "The United States Patent and Trademark Office shall be deemed, for the purposes of venue

in civil actions, to be a resident of the district in which its principal office is located[.]" *35 U.S.C. § 1(b)*. "The residence of an official defendant is determined on the basis of the official residence [*4] of the federal officer or agency." *Franz v. United States, 591 F. Supp. 374, 377 (D.D.C. 1984)* (citing *Lamont v. Haig, 192 U.S. App. D.C. 8, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978)* (explaining that the official residence of a federal defendant is the district where his official duties are performed and not the personal residence of the individual).

When venue is wrongly or improperly laid, the district court shall dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *28 U.S.C. § 1406(a)*. The decision of whether to dismiss or transfer rests within the sound discretion of the district court. *Naartex Consulting Corp. v. Watt, 232 U.S. App. D.C. 293, 722 F.2d 779, 789 (D.C. Cir. 1983)*. Generally, the interests of justice require transferring such cases to the appropriate judicial district rather than dismissing them. *Hoffman v. Fairfax County Redev. & Hous. Auth., 276 F. Supp. 2d 14, 19 (D.D.C. 2003)* (citing *Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466-67, 82 S. Ct. 913, 8 L. Ed. 2d 39 (1962)*; *see also Varma, 421 F. Supp. 2d at 115* (finding transfer to be in the interest of justice because "to dismiss the action and direct the . . . plaintiff to refile her motion would be [*5] needlessly duplicative and costly"); *Capital Bank Int'l, Ltd. v. Citigroup, Inc., 276 F. Supp. 2d 72, 78 (D.D.C. 2003)* (granting transfer because it "will save the parties the time and expense of refiling this lawsuit in a different court").

The parties do not dispute that USPTO maintains its principal office in Alexandria, Virginia and Dudas performs his official duties there. Although Dudas also serves as an officer in the Department of Commerce, which is located in the District, the parties agree that for the purposes of this case he is being sued in his official capacity as the director of the USPTO. Further, the event giving rise to this action was Dudas's denial of Michilin's correction request. There is no disagreement that this decision was made in USPTO's Virginia office. [1] Thus,

for purposes of venue, Dudas resides in Alexandria, Virginia, which is located within the Eastern District of Virginia.

> 1    While Michilin also argues that venue is appropriate here because the *'701 patent* is located in the District given Michilin's pending patent infringement suit, that suit was recently dismissed at the parties' request. (*See Michilin Prosperity Co., Ltd. v. Fellowes Mfg. Co.*, Civil [*6] Action No. 04-1025 (RWR), Stipulation of Dismissal filed on July 5, 2007.)

Even though venue is improper here, transfer of this case to a forum in which venue is proper is favored over dismissal. Dismissing the case here and requiring Michilin to refile its complaint in Virginia would be "needlessly duplicative and costly." *Varma, 421 F. Supp. 2d at 115*. Further, Dudas agrees that transfer would be appropriate here. As such, this case will be transferred to the Eastern District of Virginia.

## CONCLUSION AND ORDER

Although venue is improper in the District, because justice favors transfer to the Eastern District of Virginia over dismissal, Dudas's motion to transfer will be granted. Accordingly, it is hereby

ORDERED that Dudas's motion [8] to transfer be, and hereby is, GRANTED. This case will be transferred to the Eastern District of Virginia. It is further

ORDERED that Dudas's motion [13] to strike be, and hereby is, DENIED as moot.

The Clerk of the Court is directed to transfer this case accordingly.

SIGNED this 31st day of July, 2007.

RICHARD W. ROBERTS

UNITED STATES DISTRICT JUDGE

# EXHIBIT J

FOCUS - 6 of 17 DOCUMENTS

**GOVERNMENT RELATIONS INC., Plaintiff/Counterdefendant, v. ALLYNN HOWE, Defendant/Counterclaimant.**

**Civil Action No. 05-1081 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2007 U.S. Dist. LEXIS 4952*

**January 24, 2007, Decided**
**January 24, 2007, Filed**

**COUNSEL:** [*1] For GOVERNMENT RELATIONS INC, Plaintiff: David E. Fox, LEAD ATTORNEY, Washington, DC.

For ALLYNN HOWE, Defendant: Anne M. Wagner, LEAD ATTORNEY, Washington, DC.; Todd A. Bromberg, WILEY REIN & FIELDING, Washington, DC.

For ALLYNN HOWE, Counter Claimant: Anne M. Wagner, LEAD ATTORNEY, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION**

**MEMORANDUM OPINION**

(January 24, 2007)

Presently before the Court are Defendant-Counterclaimant (hereinafter "Defendant") Allynn Howe's [18] Motion to Dismiss; Plaintiff-Counterdefendant (hereinafter "Plaintiff") Government Relations, Inc.'s [21] Motion to Enlarge Time; and Plaintiff's [24] Motion to Amend Complaint Nunc Pro Tunc. Based on the aforementioned motions and related filings thereto, prior orders in the instant case, and the relevant statutes and case law, the Court shall DENY Plaintiff's [24] Motion to Amend Complaint Nunc Pro Tunc, DENY Plaintiff's [21] Motion to Enlarge Time, and GRANT Defendant's [18] Motion to Dismiss. The Court shall DISMISS WITH PREJUDICE Plaintiff's Amended Complaint in its entirety. Defendant's counterclaims against Plaintiff remain. [*2] Defendant/Counterclaimant shall file a notice with the Court by February 7, 2007, as to whether he plans to proceed with his counterclaims.

**I. BACKGROUND**

Plaintiff, Government Relations Inc., filed a Complaint in this case against Defendant, Allynn Howe, [1] in the Superior Court of the District of Columbia, which was removed to this Court on May 31, 2005. Defendant filed a [2] Motion to Dismiss Counts 2 through 6 of the Complaint on June 7, 2005, which put Plaintiff on notice as to Defendant's perceptions of some of the infirmities in Plaintiff's Complaint. Defendant also filed an [4] Answer and Counterclaim on June 16, 2005. Plaintiff filed an Answer to Defendant's Counterclaim on July 6, 2005. Plaintiff further filed a [12] Motion to Amend Complaint on October 13, 2005. In the Amended Complaint filed by Plaintiff, Plaintiff voluntarily dropped Counts 2, 3, and 6 of its original complaint, modified Counts 1, 4, and 5 of its original complaint, and added a fraud count.

> 1 Defendant indicated in his Counterclaim that he is a registered lobbyist. *See* [4] Def's Answer/Counterclaim PP 26, 28. Plaintiff admitted that Defendant "has worked as a lobbyist." [9] Pl.'s Answers to Counterclaim P 2.

[*3] On May 9, 2006, the Court issued an [15] Order granting Plaintiff's [12] Motion to Amend Complaint and denying without prejudice [2] Defendant Allynn Howe's Motion to Dismiss. However, despite the fact that Plaintiff had already amended its complaint once in an attempt to bolster its claims, the Court's Order indicated "that Counts 2 and 3 of the Amended Complaint are not reft with factual support, and the Court additionally notes that Count 4 of the Amended Complaint has not been pleaded with specificity as generally required of fraud claims .... [T]he Court will allow Plaintiff to file a final, Second Amended Complaint if it so chooses, with

the limitation that the Second Amended Complaint should only serve to clarify Counts 2, 3, and/or 4 of the Amended Complaint at this time." [15] Order at 3. Specifically, "Plaintiff may file a Second Amended Complaint if it so chooses in order to more clearly set forth support for Claims 2, 3, and/or 4 of its Amended Complaint by May 23, 2006. *There will be no extensions to this deadline*, and no additional amendments will be permitted as to the same Counts[.]" *Id.* at 4 (emphasis added). The Court further indicated that if [*4] "Defendant chooses to file a motion to dismiss related to the adopted Amended Complaint or the Second Amended Complaint if one is filed by the deadline above, the Parties shall abide by the following briefing schedule: Defendant's motion to dismiss is due by June 9, 2006; Plaintiff's opposition is due by June 23, 2006; Defendant's reply is due by July 7, 2006[.]" *Id.*

As Plaintiff did not file a Second Amended Complaint by May 23, 2006, Defendant filed a [18] Motion to Dismiss on June 9, 2006, in accordance with the briefing schedule set forth by the Court. Plaintiff did not file an opposition thereto on June 23, 2006; rather, Plaintiff instead filed Plaintiff's [21] Motion to Enlarge Time on June 23, 2006, requesting fourteen additional days in which to respond to Defendant's Motion to Dismiss.

In Plaintiff's [21] Motion to Enlarge Time, Plaintiff's counsel claims that he "found Defendant's Motion to Dismiss the Amended Complaint on the electronic view mechanism available at the Court the past two (2) years" on June 21, 2006, because 1) "[h]e had traveled to his daughter's college graduation in Los Angeles and there stayed at a European Style hotel (the Hilgard House) [*5] that had no computers available"; 2) he was not served by mail; 3) he "had charged a paralegal with the duty of monitoring his Federal Court cases (on the computer)" who "fell ill with a diabetic problem"; and 4) he "had three (3) Court hearings on his return." Pl.'s Mem. to Enlarge Time at 1.

Defendant filed an Opposition to Plaintiff's Motion to Enlarge Time on June 27, 2006. In Defendant's Opposition, Defendant argues that "Plaintiff ... has utterly failed to show cause for extending the time period for opposing the Motion to Dismiss. Instead, it has proffered dubious and unsupported excuses, none of which, alone or together, constitute cause for not filing a timely response to a pending dispositive motion." Def.'s Opp'n to Pl.'s Mot. to Enlarge Time at 1. Defendant argues in his opposition that Plaintiff has not shown cause to enlarge the time for filing a response pursuant to *Federal Rule of Civil Procedure 6(b)(1)*, because 1) the ECF Notice of Electronic Filing for Defendant's Motion to Dismiss shows that Plaintiff's counsel received electronic notification thereof from the Court; 2) the college graduation that Plaintiff's counsel allegedly [*6] attended took place

during the weekend of June 16-18, 2006, well after Defendant's Motion to Dismiss was filed on June 9, 2006; 3) the hotel at which Plaintiff's counsel indicated he had stayed both provided data jacks for internet usage and pointed guests to nearby facilities to access the internet; 4) Plaintiff's counsel never indicates that his paralegal's medical condition "prevented her from notifying [Plaintiff's counsel] of the filing of Defendant's Motion to Dismiss"; 5) Plaintiff's counsel "retains responsibility" for checking the docket; and 6) Plaintiff's counsel never be served by mail, as pursuant to Local Civil Rule 5.4(d)(1), "[e]lectronic filing of any document operates to effect service of the document on counsel ...." *Id.* at 2-5. Defendant argues that the Court should treat Defendant's Motion to Dismiss as conceded pursuant to Local Civil Rule 7(b), citing *Ramseur v. Barreto, 216 F.R.D. 180, 182 (D.D.C. 2003)*. On July 3, 2006, the Court entered a minute order indicating that "Plaintiff shall have until close of business on Monday, July 3, 2006 to submit a Reply to the arguments raised in [22] Defendant's Memorandum in Opposition to Plaintiff's [*7] Motion to Enlarge Time." The Court notes that Plaintiff never filed a reply to its Motion to Enlarge Time and the above assertions made by Defendant. The Court also notes that Plaintiff never filed an Opposition to Defendant's Motion to Dismiss.

On July 5, 2006, well after the May 23, 2006 deadline for filing a Second Amended Complaint set by the Court, and well after Defendant filed his [18] Motion to Dismiss, Plaintiff filed a [24] Motion to Amend Complaint Nunc Pro Tunc, attaching a Second Amended Complaint thereto. In Plaintiff's [24] Motion to Amend, Plaintiff states:

> [T]he Court allowed the Plaintiff to amend its Complaint such that the claims for relief are more clearly set forth. The Court set a deadline of May 26, 2006. [2] First, Counsel changed his email address and did not get a copy of the Order. Second, counsel was out of town, on the West Coast, giving a seminar during this time frame, and then at his daughter's college graduation.

[24] Pl.'s Mot. to Amend P 3.

[2] The Court notes that the deadline set by the Court for Plaintiff's filing of a Second Amended Complaint was May 23, 2006, not May 26, 2006.

[*8] On July 11, 2006, Defendant filed a [26] Defendant's Memorandum in Opposition to Plaintiff's Motion to Amend Complaint Nunc Pro Tunc. In Defendant's

Opposition to Plaintiff's Motion to Amend Complaint Nunc Pro Tunc, Defendant argues that Plaintiff has failed to demonstrate "excusable neglect" pursuant to *Federal Rule of Civil Procedure 6(b)(2)*, such that the Court should not grant Plaintiff's post-deadline request for an extension of time to file its Second Amended Complaint. Def.'s Opp'n to Pl.'s Mot. to Amend Compl. Nunc Pro Tunc at 1. In addition to repeating the arguments raised in Defendant's Opposition to Plaintiff's prior Motion to Extend Time, Defendant adds that 1) Plaintiff's counsel is required to notify the Court within 10 days of any address change pursuant to Local Civil Rule 5.1(e)(1), but regardless Plaintiff's counsel's e-mail address to which the Notice of Electronic Filing with respect to the Court's May 9, 2006 Order and the e-mail address receipt from Plaintiff's own Motion to Amend Complaint Nunc Pro Tunc are one and the same; and 2) Plaintiff's counsel never alleged in his Motion to Extend Time that he had not received [*9] the Court's May 9, 2006 Order. *Id.* at 2-3. Defendant argues that "the Court should reject the instant request to amend the complaint because it reflects undue delay, bad faith and dilatory motive on the part of Gill." *Id.* at 4. The Court notes that Plaintiff did not file any Reply thereto.

## II. LEGAL STANDARDS

### A. Federal. Rule of Civil Procedure 6(b)

Pursuant to *Federal Rule of Civil Procedure 6(b)*,

When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect[.]

*Fed. R. Civ. P. 6(b).* A district court's decision pursuant to *Rule 6(b)* is reviewed for abuse of [*10] discretion. *See In re Vitamins Antitrust Class Actions, 356 U.S. App. D.C. 70, 327 F.3d 1207, 1209 (D.C. Cir. 2003).* With respect to the distinction between *Rule 6(b)(1)*, and *Rule 6(b)(2)*, the instant circuit observed:

In *Lujan v. National Wildlife Federation*, the Supreme Court noted the distinction between this provision and *Rule*

*6(b)(1)*, which allows a court to grant an extension if a "request" is made before the time for filing expires. *497 U.S. 871, 896 n.5, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).* By contrast, the Court emphasized that post-deadline extensions may be granted only "for cause shown" and "upon motion." *Id. at 896, 110 S. Ct. 3177.*

*Smith v. District of Columbia, 368 U.S. App. D.C. 361, 430 F.3d 450, 456 (D.C. Cir. 2005).* In determining what constitutes "excusable neglect" pursuant to *Rule 6(b)(2)*, the Court may consider the danger of prejudice to the other party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay (including the movant's control, or lack thereof, with respect to the delay), and whether or not the movant acted in good faith. *See id. at 457 n.5* (quoting [*11] *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)).*

### B. Local Civil Rule 7(b)

Pursuant to Local Civil Rule 7(b), "Within 11 days of the date of service or at such other time as the Court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion. If such memorandum is not filed within the prescribed time, the Court may treat the motion as conceded." D.C. LCvR 7(b). Discretion to determine whether a motion is treated as conceded for failure to timely file an opposition "lies wholly with the district court" *F.D.I.C. v. Bender, 326 U.S. App. D.C. 390, 127 F.3d 58, 67 (D.C. Cir. 1997).* "'Where the district court relies on the absence of a response as a basis for treating [a] motion as conceded, we honor its enforcement' of Local Rule 7(b)." *Harrison v. Snow, 2004 U.S. App. LEXIS 26401, 2004 WL 2915335 (D.C. Cir.)* (quoting *Twelve John Does v. District of Columbia, 326 U.S. App. D.C. 17, 117 F.3d 571, 577 (D.C. Cir. 1997)).*

### C. Federal Rule of Civil Procedure 15(a)

Under *Federal Rule of Civil Procedure 15(a)* [*12] , once a responsive pleading is served, a party may amend its complaint only by leave of the court or by written consent of the adverse party. *Id.; Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).* The grant or denial of leave to amend is committed to the sound discretion of the district court. *See Firestone v. Firestone, 316 U.S. App. D.C. 152, 76 F.3d 1205, 1208 (D.C. Cir. 1996).* "Reversal of a district court's decision not to permit amendment is thus appropriate only if there has been an abuse of discretion." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,*

*258 U.S. App. D.C. 124, 810 F.2d 243, 247 (D.C. Cir. 1987)*.

The court must, however, heed *Rule 15*'s mandate that leave is to be "freely given when justice so requires." *Id. See also Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 331 U.S. App. D.C. 226, 148 F.3d 1080, 1083 (D.C. Cir. 1998)*. Generally, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [plaintiff] ought to be afforded an opportunity to test his claim on the merits." *Foman, 371 U.S. at 182, 83 S. Ct. 227.* As such, "[a]lthough the grant or denial of [*13] leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment.'" *Firestone, 76 F.3d at 1208* (quoting *Foman, 371 U.S. at 182, 83 S. Ct. 227*).

## III. DISCUSSION

### A. Plaintiff's Motion to Amend Complaint Nunc Pro Tunc

The Court, via its Order of May 9, 2006, stated "that Plaintiff may file a Second Amended Complaint if it so chooses in order to more clearly set forth support for Claims 2, 3, and/or 4 of its Amended Complaint by May 23, 2006. *There will be no extensions of this deadline,* and no additional amendments will be permitted as to the same Counts[.]" [15] Order at 4 (emphasis added). With respect to Plaintiff's untimely request to amend its complaint a second time, Plaintiff's counsel claims that "First, Counsel changed his email address and did not get a copy of the Order. Second, counsel was out of town, on the West Coast, giving a seminar during this time frame, and then at his daughter's [*14] college graduation." [24] Pl.'s Mot. to Amend P 3.

The Court finds that Plaintiff's counsel's unsubstantiated excuses amount to "dilatory motive" "undue delay" and "bad faith" pursuant to *Federal Rule of Civil Procedure 15(a)*, such that the Court shall deny Plaintiff's [24] Motion to Amend Complaint Nunc Pro Tunc. First of all, the Court notes that the Court's Order dated May 9, 2006, provided both a firm deadline for the filing of a Second Amended Complaint and a briefing schedule, which was followed by Defendant, such that Plaintiff's untimely filing constitutes Plaintiff's second attempt to nullify a pending Motion to Dismiss by amending its complaint, suggesting dilatory motive for the delay. Second, Plaintiff's counsel's indication that he was on the West Coast (and for an unspecified time period) does not excuse his unduly late filing. Third, counsel clearly accessed the docket on June 21, 2006 (per his own representation in Plaintiff's [21] Motion to Extend Time) such that by his own admission, he was able to see the Court's May 9,

2006 Order approximately 15 days before he filed his [24] Motion to Amend Complaint Nunc Pro Tunc. [*15] Finally, and most egregiously, the Court finds Plaintiff's counsel's representation that he "did not get a copy" of the Court's May 9, 2006 Order to be in bad faith. Pursuant to Local Civil Rule 5.4(b)(6), "counsel ... are responsible for monitoring their e-mail accounts, and, upon receipt of notice of an electronic filing, for retrieving the noticed filing." LCvR 5.4(b)(6). "The requirement of a certificate or other proof of service is satisfied by the automatic notice of filing sent by the CMJECF software to counsel or pro se parties who have obtained CM/ECF passwords." LCvR 5.4(d)(2). Plaintiff's counsel does not refute Defendant's statement that the Court's May 9, 2006 Order was sent to the same e-mail address to which Plaintiff's own [24] Motion to Amend Complaint Nunc Pro Tunc was noticed Furthermore, the Court made an inquiry of Joe Burgess, the Operations Analyst for United States District Court for the District of Columbia, with respect to Plaintiff's counsel's representations. In a signed statement, attached to this Opinion as Exhibit A, Mr. Burgess stated that after viewing the records and receipts for all transactions in the instant case, "[t]he receipts support that [*16] David E. Fox [counsel for Plaintiff] has never changed his email address in the system since the beginning of this case." Furthermore, "at [the Court's] request, [Mr. Burgess] examined the bounced emails for May 9, 2006[] (# 15 Order denying without prejudice motion to dismiss; granting motion to amend) and July 3, 2006 (Minute Order). There were no bounced emails for these dates relating to this case for either counsel." Ex. 1 (Burgess Memorandum). [3] In sum, the Court finds Plaintiff's counsel's untimely filing of a second amended complaint to be the product of an unacceptable combination of undue delay, dilatory motive, and bad faith in light of the above.

> 3    The attachments referenced in the Burgess Memorandum, including the "receipts for all transactions in this case" and "attached test data base example for CA 03-3030," are too voluminous to attach to this Opinion and may be found in the Clerk's Office in the case file for the instant case.

As the Court's May 9, 2006 Order required Plaintiff to [*17] file a Second Amended Complaint by May 23, 2006 with no extensions, the Court also holds that Plaintiff's request, while not made pursuant to *Federal Rule of Civil Procedure 6(b)(2)*, nonetheless does not meet the requirements of *Federal Rule of Civil Procedure 6(b)*, which states: "When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... (2) upon motion made after the expiration of the specified

period permit the act to be done where the failure to act was the result of excusable neglect[.]" *Fed. R. Civ. P. 6(b)*. No such motion was made pursuant to *Federal Rule of Civil Procedure 6(b)* in the instant case. In light of this and the above findings with respect to Plaintiff's Motion to Amend Complaint Nunc Pro Tune, the Court does not find that Plaintiff has demonstrated excusable neglect for the post-May 23, 2006 filing of Plaintiff's Motion to Amend Complaint.

Accordingly, the Court [*18] shall deny Plaintiff's Motion to Amend Complaint Nunc Pro Tunc.

*B. Plaintiff's Motion to Extend Time to File an Opposition to Defendant's Motion to Dismiss*

In Plaintiff's [21] Motion to Enlarge Time, requesting fourteen additional days in which to respond to Defendant's Motion to Dismiss, Plaintiff's counsel claims that he "found Defendant's Motion to Dismiss the Amended Complaint on the electronic view mechanism available at the Court the past two (2) years" on June 21, 2006, because 1) "[h]e had traveled to his daughter's college graduation in Los Angeles and there stayed at a European Style hotel (the Hilgard House) that had no computers available"; 2) he was not served by mail; 3) he "had charged a paralegal with the duty of monitoring his Federal Court cases (on the computer)" who "fell ill with a diabetic problem"; and 4) he "had three (3) Court hearings on his return." Pl.'s Mem. to Enlarge Time at 1. In Defendant's Opposition thereto, Defendant argues that Plaintiff has not shown cause to enlarge the time for filing a response pursuant to *Federal Rule of Civil Procedure 6(b)(1)*, because 1) the ECF Notice of Electronic Filing [*19] for Defendant's Motion to Dismiss shows that Plaintiff's counsel received electronic notification thereof from the Court; 2) the college graduation that Plaintiff's counsel allegedly attended took place during the weekend of June 16-18, 2006, well after Defendant's Motion to Dismiss was filed on June 9, 2006; 3) the hotel at which Plaintiff's counsel indicated he had stayed both provided data jacks for internet usage and pointed guests to nearby facilities to access the internet; 4) Plaintiff's counsel never indicates that his paralegal's medical condition "prevented her from notifying [Plaintiff's counsel] of the filing of Defendant's Motion to Dismiss"; 5) Plaintiff's counsel "retains responsibility" for checking the docket; and 6) Plaintiff's counsel need not be served by mail, as pursuant to Local Civil Rule 5.4(d)(1), "[e]lectronic filing of any document operates to effect service of the document on counsel ...." *Id.* at 2-5. Plaintiff never filed a Reply to Defendant's Motion to Enlarge Time, nor any response to Defendant's assertions with respect to Plaintiff's counsel's misrepresentations to the Court with respect to the timing of his trip and his ability to access the [*20] interne during this time. In fact, in

Plaintiff's later-filed Motion to Amend Complaint Nunc Pro Tune, discussed in Section III(A) of this Opinion, Plaintiff's counsel essentially repeats his already-refuted excuse, stating "counsel was out of town, on the West Coast, giving a seminar during this time frame, and then at his daughter's college graduation." [24] Pl.'s Mot. to Amend P 3.

Plaintiff's [21] Motion to Enlarge Time to respond to Defendant's Motion to Dismiss was filed on the day that Plaintiff's Opposition was due, such that Plaintiff's request was made pursuant to *Federal Rule of Civil Procedure 6(b)(1)*. See *Fed. R. Civ. P. 6(b)(1)* ("When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order ...."). Normally, in light of the distinction made in *Lujan* between [*21] *Rule 6(b)(1)* and *6(b)(2)*, see *Lujan, 497 U.S. at 896, 110 S. Ct. 3177*, and the more lenient standard applied under *Rule 6(b)(1)*, the Court would grant a request for extension of time in the instant posture. However, the Court does not consider "cause" to have been "shown" pursuant to *Rule 6(b)(1)* in light of the repeated and unrefuted misrepresentations made by Plaintiff's counsel to this Court as the basis for his Motion to Extend Time. "[C]ourts 'must trust and rely on lawyers' abilities to discharge their ethical obligations, including their duty of candor to the court'; otherwise, the adversary process, the judicial system and the legal profession itself are in grave jeopardy." *Minebea Co., Ltd. v. Papst, 374 F. Supp. 2d 231, 237 (D.D.C. 2005)* (quoting *United States v. Rhynes, 218 F.3d 310, 320 (4th Cir. 2000)*). See also D.C. Rule of Prof. Conduct 3.3 ("Candor Toward the Tribunal"). Accordingly, the Court shall deny Plaintiff's Motion to Extend Time and accordingly assesses Defendant's pending Motion to Dismiss without any opposition filed by Plaintiff. The Court suggests that any frustrations Plaintiff may have with this [*22] outcome should not be legally directed toward the Court's decision in light of Plaintiff's counsel's misrepresentations and lack of candor to the Court, but toward Plaintiff's counsel himself.

*C. Defendant's Motion to Dismiss*

Pursuant to Local Civil Rule 7(b), "Within 11 days of the date of service or at such other time as the Court may direct, an opposing party shall serve and fife a memorandum of points and authorities in opposition to the motion. If such memorandum is not filed within the prescribed time, the Court may treat the motion as conceded." Local Civil Rule 7(b). However, while the Court

shall not permit Plaintiff to file an Opposition to Plaintiff's Motion to Dismiss for the reasons set forth in Section III(B) of this Opinion, the Court shall not only grant Defendant's Motion to Dismiss as conceded, but also shall assess the Motion to Dismiss on the merits without the aid of an opposition. In so doing, the Court finds that on the merits, it shall grant Defendant's [18] Motion to Dismiss Plaintiff's Amended Complaint in its entirety.

In evaluating a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court must construe the complaint in a light most [*23] favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig., 854 F. Supp. 914, 915 (D.D.C. 1994)*; *see also Schuler v. United States, 199 U.S. App. D.C. 23, 617 F.2d 605, 608 (D.C. Cir. 1979)* ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal, 16 F.3d at 1276*. Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC, 328 U.S. App. D.C. 52, 132 F.3d 753, 762 (D.C. Cir. 1997)*. The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See St. Francis Xavier Sch., 117 F.3d at 624*; *Marshall County Health Care Auth. v. Shalala, 300 U.S. App. D.C. 263, 988 F.2d 1221, 1226 n.6 (D.C. Cu. 1993)*. [*24] Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule "12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy, 308 U.S. App. D.C. 36, 29 F.3d 682, 688 (D.C. Cir. 1994)*; *cf. Behrens v. Pelletier, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)* (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

The Court will consider the merits of Defendant's Motion to Dismiss each of Plaintiff's Counts as set forth in its Amended Complaint in turn. As this case is presently before the Court under diversity jurisdiction, the Court shall apply the choice of law rules from the District of Columbia. *See Ideal Elec. Sec. Co. v. Int'l Fidelity Insur. Co., 327 U.S. App. D.C. 60, 129 F.3d 143, 148 (D.C. Cir. 1997)* ("When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."). For tort claims, like those raised by Plaintiff, District of Columbia law employs a government interest

test such that the law of the state with the greater interest [*25] in the controversy will apply. *Herbert v. District of Columbia, 808 A.2d 776, 779 (D.C. 2002)*. In determining which state has the greater interest, the court considers 1) "the place where the injury occurred;" 2) "the place where the conduct causing the injury occurred;" 3) the place where the relationship between the parties is centered, and 4) "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* The Court notes that it accepts Plaintiff's representation in its Amended Complaint that [a]ll events which gave rise to this cause of action took place in the District of Columbia," Am. Compl. P 1, solely for the purposes of ruling on Defendant's Motion to Dismiss. Accordingly, although the Court notes that Defendant is a resident of the Commonwealth of Virginia as stated in Plaintiff's original complaint, Compl. P 2, applying the above factors *in toto*, the Court will appropriately apply District of Columbia law to Plaintiff's claims at this juncture.

1. Count 1: Tortious Interference with Contract

In Count 1 of Plaintiff's Amended Complaint, Plaintiff alleges that while "it was the duty of the Defendant, [*26] HOWE, to act as an employee of GRI and to further the business of his employer," Defendant "acted to take business away from his employer and to bring that business to his own company which directly competes with that of his employer." Aim Compl. PP 9, 10. Plaintiff further states "[t]hat as a result of these actions, the Plaintiff, GRI, lost business and was harmed both financially and in its reputation[,]" *id.* P 11, which it later describes as "serious damages, loss of clients, loss of reputation, and ... loss of confidential information." *Id.* P 14. Plaintiff "specifically" alleges that Defendant "[v]iolated the employer/employee relationship"; "accessed valuable trade secrets, confidential business information, client lists, insider knowledge and information"; "failed to carry out the business of his employer"; "convinced current clients, new clients and potential clients to leave the plaintiff's firm and to join the Defendant's company"; "failed to work for his employer"; and "betrayed his employer." *Id.* P 13(a)-(f). The only other factual predicate offered by Plaintiff in the Amended Complaint (which is applicable to all Counts) is the statement in the "Backgound" [*27] section that Defendant Howe was allegedly employed by Plaintiff until December 21, 2004; that Defendant, "as an employee of GRI, had access to valuable trade secrets, client lists, insider information, contacts, confidential information about plaintiff's clients and other unique business information"; and that Plaintiff was accepting a salary of $ 200,000. *Id.* PP 2-4. In Defendant's Motion to Dismiss, Defendant argues that "GRI's complaint does not satisfy the pleading requirements with regard to any of the four elements of its tor-

tious interference claim" such that Defendant does not have "'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Def.'s Mot. to Dismiss at 7 (quoting *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577 (2005)* (internal quotation omitted)).

A claim for tortious interference with contract entails four elements under District of Columbia law: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.'" *CASCO Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 83 (D.C. 2003) [*28]* (quoting *Paul v. Howard Univ., 754 A.2d 297, 309 (D.C. 2000)* (footnote and citation omitted)). *See also PM Services Co. v. ODOI Assoc., 2006 U.S. Dist. LEXIS 655, 2006 WL 20382 at *34 (D.D.C. 2006); Furash & Co. v. McClave, 130 F. Supp. 2d 48, 55-56 (D.D.C. 2001); Mercer Mgmt. Consulting v. Wilde, 920 F. Supp. 219, 239 (D.D.C. 1996).* [4]

> 4  While *PM Services, Furash,* and *Mercer* pertain to intentional interference with a prospective business advantage or business relationship, "[t]he tort of intentional interference with a prospective business advantage runs 'parallel to that for interference with existing contracts.'" *Brown v. Carr, 503 A.2d 1241, 1247 (D.C. 1986)* (quoting W. Prosser, Law of Torts § 130, at 952 (4th ed. 1971) (footnote omitted)); citing *DeKine v. Dist. of Columbia, 422 A.2d 981, 988 (D.C. 1980)).*

The Court finds that even an extremely deferential reading of Plaintiff's Amended Complaint reveals that Plaintiff [*29] has failed to plead "the existence of a contract[,]" "intentional procurement of a breach of the contract[,]" or "damages resulting from the breach" sufficient to state a claim of tortious interference with a contract. Tortious interference with a contract plainly requires interference with the contract of a third party. "[I]nterference with contractual relations ... only arises, however, if there is interference with a contract between the plaintiff and some third party." *Bus. Equip. Ctr., Ltd. v. DeJur-AMSCO Corp., 465 F. Supp. 775, 788 (D.D.C. 1978).* However, as Defendant indicates, Plaintiff has not specified in its Amended' Complaint what "contract" it is alleging to be the subject of tortious interference. *See* Def.'s Mot. to Dismiss at 7 ("GRI's complaint ... is completely devoid of any facts that identify or describe a single contract or contractual relationship with which Mr. Howe allegedly interfered."). If Plaintiff were properly bringing a claim of tortious interference with a contract, it would have specified with what third-party contract Plaintiff allegedly interfered. While Plaintiff has not

so specified, if Plaintiff is suggesting that Defendant [*30] has somehow "interfered" with his own contract with Plaintiff, this allegation falls outside of the rubric of tortious interference with contract. Furthermore, Plaintiff never pleads any details regarding the nature of any "contract" between Plaintiff and Defendant, such as whether the Parties had any written or oral agreement and the terms of said agreement (such as a do-not-compete clause). Additionally, notwithstanding the fact that Plaintiff has not specified any contract as the subject of tortious interference in its Amended Complaint, Plaintiff plainly has not demonstrated that Defendant intentionally procured a breach of the contract. Intentionally procuring a breach of the contract requires "a strong showing of intent ... to establish liability." *Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423 (D.D.C. 1998)* (internal quotation omitted). Intentional procurement of a breach must involve egregious conduct such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *See Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)* (quoting *Genetic Sys., 691 F. Supp. at 423*). [*31] Plaintiff has not pleaded any facts, but only broad allegations, regarding Defendant's conduct, let alone whether or not such unspecified conduct was egregious. Finally, Plaintiff has not pleaded any facts demonstrating that it has incurred any damages as a result of Defendant's conduct. Plaintiff merely speculates that Plaintiff suffered "serious damages, loss of clients, loss of reputation, and ... loss of confidential information," Am. Compl. P 14, but does not state any facts demonstrating such "serious" damages, any actual loss of clients, and indicators that Plaintiff has suffered a loss of reputation, nor any "confidential" information actually "lost." "[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., 544 U.S. at 347, 125 S. Ct. 1627.* Accordingly, the Court shall grant Defendant's Motion to Dismiss with respect to Count 1 of Plaintiff's Amended Complaint, as Plaintiff has failed to state a claim of Tortious Interference with Contract against Defendant.

## 2. Count 2: Breach of Fiduciary Duty

In [*32] Count 2 of Plaintiff's Amended Complaint, Plaintiff alleges that Defendant, "the public face of Plaintiff's company ... in a position of trust with GRI ... [and] paid to act in the best interests of his employer," breached his fiduciary duty to Plaintiff "act[ing] to take business away from his employer, breaching his fiduciary duty and to bring that business to his own company which directly competes with that of his employer." Am. Compl. PP 17-19. Plaintiff repeats the alleged damages of loss of clients, loss of reputation, and loss of confiden-

tial information claimed in Count 1. *See* Am. Compl. PP 20, 23; *see also id.* PP 11, 14. Plaintiff also repeats its allegations set forth in Count 1 that Defendant "[v]iolated the employer/employee relationship"; "accessed valuable trade secrets, confidential business information, client lists, insider knowledge and information"; "failed to carry out the business of his employer"; "convinced current clients, new clients and potential clients to leave the plaintiff's firm and to join the Defendant's company"; "failed to work for his employer"; and "betrayed his employer." *Id.* P 22(a)-(f). In Defendant's Motion to Dismiss, Defendant [*33] argues that "the Amended Complaint does not sufficiently allege the underlying factual predicate of an employment relationship to support the duty element of [breach of fiduciary duty] ... [b]ut even if it did, Count 11. plainly lacks the necessary factual specificity with regard to the alleged breach such that it does not give Mr. Howe adequate notice of the grounds for this claim." Def's Mot. to Dismiss at 10.

Multiple recent cases in this jurisdiction have applied the common law principles and limitations of agency law into the field of corporate employment. *See, e.g., PM Services, 2006 U.S. Dist. LEXIS 655, 2006 WL 20382; Furash, 130 F. Supp. 2d 48; Riggs Inv. Mgmt. Corp. v. Columbia Partners, 966 F. Supp. 1250 (D.D.C. 1997);* and *Mercer, 920 F. Supp. 219.* Under this application, it has been established that employees - especially managers, corporate officers, and directors - "owe 'an undivided and unselfish loyalty to the corporation' such that 'there shall be no conflict between duty and self interest.'" *Mercer, 920 F. Supp. at 233* (quoting *Guth v. Loft, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939); see* [*34] *also Restatement (Second) of Agency § 387* ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters concerned with his agency."). Ultimately, -an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency.' *Id.* (quoting *Restatement (Second) of Agency § 393*).

However, while "concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation," *Maryland Metals, Inc. v. Metzner, 282 Md. 31, 382 A.2d 564, 568 (1978),* "there is an off-setting policy 'recognized by the courts ... of safeguarding society's interest in fostering free and vigorous competition in the economics sphere,' *Sci. Accessories Corp. v. Summagraphics Corp., 425 A.2d 957, 963 (Del. 1980)* (quoting *Maryland Metals, 382 A.2d at 569*). "[T]he law is clear that 'an agent can make arrangements or plans to go into competition with his principal before [*35] terminating his agency, provided no unfair acts are committed or injury done his

principal.' *Mercer, 920 F. Supp. at 233* (quoting *Sci. Accessories Corp., 425 A.2d at 962*). In general,

> [e]ven before the termination of the agency, [an employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

*Id.* (quoting *Restatement (Second) of Agency § 393 comment e*).

An employee's "privilege to compete is limited." *Riggs Inv. Mgmt. Corp., 966 F. Supp. at 1265.* 'The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty.'" *Sci. Accessories Corp., 425 A.2d at 965* (quoting *Maryland Metals, 382 A.2d at 569-70*). An employee's proper preparatory activities have been [*36] delineated as such:

> Prior to termination of employment, an officer may not solicit for himself or herself business which the position requires the employee to obtain for the employer. The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of his employer.

*Mercer, 920 F. Supp. at 234* (quoting William W. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 856 (perm. ed. rev. vol. 1994)). "In preparing to compete, an employee may not commit wrongful acts, 'such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees.'" *Furash, 130 F. Supp. 2d at 53* (quoting *Mercer, 920 F. Supp. at 234*); *see also Sci. Accessories, 425 A.2d at 965* (noting that "[e]xamples of misconduct which will defeat the privilege" to make arrangements to compete include "misappropriation of trade secrets"; "misuse of confidential information"; "solicitation of employer's customers prior to cessation of employment"; [*37] "conspiracy to bring about mass resignation of employer's key employees"; and "usurpation of 'employer's business opportunity'"). "At the same time, failure to disclose plans to enter into competition is not itself necessarily a breach of fiduciary

duty." *Mercer, 920 F. Supp. at 234.* Ultimately, various courts have recognized that "[t]he ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Furash, 130 F. Supp. 2d at 53; Mercer, 920 F. Supp. at 234; Maryland Metals, 382 A.2d at 570; Sci. Accessories, 425 A.2d at 965;* Fletcher Cyclopedia Corporations § 856.

Assuming *arguendo* that Defendant had an employment relationship with Plaintiff, the Court finds that Plaintiff has pleaded no facts whatsoever with respect to its blanket allegations that Defendant "[v]iolated the employer/employee relationship"; "accessed valuable trade secrets, confidential business information, client lists, insider knowledge and information"; [*38] "failed to carry out the business of his employer"; "convinced current clients, new clients and potential clients to leave the plaintiff's firm and to join the Defendant's company"; "failed to work for his employer"; and "betrayed his employer." *Id.* P 22(a)-(f). As stated above, on a Motion to Dismiss for failure to state a claim, while the Court must construe the Amended Complaint in Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal, 16 F.3d at 1276.* The court is in fact limited to considering facts alleged in the complaint, any documents attached to or incorporated-in the complaint, matters of which the court may take judicial notice, and matters of public record. *See St. Francis Xavier Sch., 117 F.3d at 624; Marshall County Health Care Auth. v. Shalala, 300 U.S. App. D.C. 263, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).* Plaintiff has not provided the Court with any facts supporting its claims of Defendant's alleged misconduct and/or "wrongful acts"-not one date, client taken away or attempted to be taken away by Defendant, insider knowledge accessed [*39] by the Defendant, nothing. As such, the Court shall grant Defendant's Motion to Dismiss for failure to state a claim with respect to Count 2 of Plaintiff's Complaint.

3. Count 3: Misappropriation and Conversion

In Count 3 of Plaintiff's Amended Complaint, Plaintiff alleges that "defendant, HOWE, misappropriated and converted client lists, trade secrets and confidential information and breached his fiduciary duties." Am Compl. P 31. Plaintiff states that Defendant was "the public face of Plaintiff's company ... was paid to act in the best interests of his employer ... [and] [n]otwithstanding said duties ... did then and there carelessly, willfully, and recklessly misappropriat[e] client lists, confidential information, and trade secrets and conver[t] them to his own use and for that of establishing his own company. *Id.* P 26-28. Plaintiff repeats the allega-

tions (i.e., "violated the employer/employee relationship, etc.") as well as the alleged harm set forth in Counts 1 and 2. *Id.* PP 29, 31(a)-(f), 32. In Defendant's Motion to Dismiss, Defendant argues that this Count "suffers from the same legal deficiency that plagues Count III, namely, failure to plead with adequate [*40] specificity the necessary elements of a misappropriation or conversion claim. *See Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. at 1630.*" Def.'s Mot. to Dismiss at 13.

Pursuant to *D.C. Code § 36-401(2),* "misappropriation" is defined as:

A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(I) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change in his or her position, knew or had reason to know that the information was a trade secret and knowledge of the trade [*41] secret had been acquired by accident or mistake.

*D.C. Code § 36-401(2).* "Trade Secret" is further defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy." *D.C. Code § 36-401(4).*

Plaintiff has not identified any "trade secret" in its Amended Complaint sufficient to allege a claim of misappropriation against Defendant. While Plaintiff states generally that Defendant "misappropriated and converted client lists," the Court agrees with Defendant's assessment that the client list of a registered lobbyist such as Plaintiff is not a "trade secret," due to Plaintiff's legal obligation to publicly disclose its clients. *See* Def.'s Mot. to Dismiss at 15-16; Lobbying Disclosure Act of 1995, *2 U.S.C.A. §§ 1601-12 (West 2006). See also PM Services, 2006 U.S. Dist. LEXIS 655, 2006 WL 20382* [*42] *at *29.*

Conversion is "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto." *Shea v. Fridley, 123 A.2d 358, 361 (D.C. 1956); Furash, 130 F. Supp. at 58.* When the initial possession of the property is lawful, "in the absence of other facts and circumstances independently establishing conversion, a demand for return is necessary to show the adverse nature of the possession." *Furash, 130 F. Supp. at 58.* If a plaintiff retains the original or copies of a document, said Plaintiff cannot state a claim for conversion because the owner has not been "deprived" of its use. *Id.*

Plaintiff clearly does not state any facts supporting a claim of conversion against Defendant, as Plaintiff has not identified any personal property taken by Defendant that it can no longer access because Defendant has exclusive access to or use of it. In sum, Plaintiff has failed to state a claim for either misappropriation or conversion such that the Court shall grant Defendant's Motion to Dismiss with respect to Count 3 of Plaintiff's Amended Complaint.

### 4. Count 4: Fraud

[*43] In Count 4 of Plaintiff's Amended Complaint, entitled "Fraud," Plaintiff largely repeats the allegations as set forth in Count 3. Plaintiff argues that Defendant "misappropriated client lists, confidential information, and trade secrets and converted them to his own use and for that of establishing his own company." Am. Compl. P 37. Plaintiff seems to imply a claim of fraud in its Complaint by repeating its list of allegations against Defen-

dant (i.e., "violated the employer/employee relationship, etc."), alleged harms, and additionally emphasizing that Defendant "was accepting a salary to work on behalf of his employer and to expand the business of his employer." *Id.* P 34. In Defendant's Motion to Dismiss, Defendant argues that "GRI's failure to meet the specific pleading requirements for fraud under District of Columbia law and the Federal Rules of Civil Procedure dictates the dismissal of its fraud count." Def.'s Mot. to Dismiss at 17-18.

Under District of Columbia law, an allegation of fraud must be pleaded with particularity, including facts that reveal the following essential elements: (1) a false representation; (2) concerning a material fact; (3) made with knowledge of [*44] its falsity; (4) with the intent to deceive; and (5) upon which reliance is placed. *Higgs v. Higgs, 472 A.2d 875, 876 (D.C. 1984); Calvetti v. Antcliff, 346 F. Supp. 2d 92, 100 (D.D.C. 2004).* Also, pursuant to *Federal Rule of Civil Procedure 9(b),* "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See also United States v. Cannon, 206 U.S. App. D.C. 405, 642 F.2d 1373, 1385 (D.C. Cir. 1981)* (stating that normally a pleader must state the time, place, and content of false misrepresentations, the fact misrepresented, and what was obtained as a result of the fraud); *Wiggins v. District Cablevision, Inc., 853 F. Supp. 484, 498 (D.D.C. 1994)* (holding that pursuant to *Rule 9(b),* a pleader must allege facts that demonstrate all of the required elements of fraud).

In its Order dated May 9, 2006, upon reviewing the Amended Complaint, the Court noted that "Count 4 of the Amended Complaint has not been pleaded with specificity as generally required of fraud claims[.]" [15] Order at 3. The Court reiterates that statement here. Plaintiff's Amended Complaint, [*45] which alleges to set forth a "Fraud" claim simply by including the word in its heading, does not plead with particularity any facts with respect to its allegations against Defendant. In fact, Plaintiff does not cite to any specific false representation made by Defendant (concerning a material fact or otherwise) such that the Court could proceed in applying the other essential elements of a fraud claim as set forth in *Higgs* and its progeny. As such, the Court shall grant Defendant's Motion to Dismiss with respect to Count 4 of Plaintiff's Amended Complaint, such that Count 4 shall be dismissed with prejudice, as Count 4 does not constitute an adequately pleaded fraud claim, and Plaintiff has forfeited its right to amend said Count as explained in Section III(A) of this Opinion.

### IV. CONCLUSION

Based on the aforementioned reasoning, Court shall DENY Plaintiff's [24] Motion to Amend Complaint

2007 U.S. Dist. LEXIS 4952, *

Nunc Pro Tune, DENY Plaintiff's [21] Motion to Enlarge Time, and GRANT Defendant's [18] Motion to Dismiss. The Court shall DISMISS Plaintiff's Amended Complaint in its entirety. Defendant's Counterclaims against Plaintiff remain. Defendant/Counterclaimant shall file a notice with [*46] the Court by February 7, 2007, as to whether he plans to proceed with his counterclaims. An Order accompanies this Memorandum Opinion.

Date: January 24, 2007

COLLEEN KOLLAR-KOTELLY

United States District Judge

***MEMORANDUM***

**TO:** Judge Colleen Kollar-Kotelly

FROM: Joe Burgess, Operations Analyst

IN RE: Emails regarding CA 05-1081, GovermentRelations Inc. v. Howe

DATE: July 6, 2006

I have examined the records in CA 05-1081, Government Relations Inc. v. Howe, and attached the receipts for all transactions in the case. The receipts support that David E. Fox has never changed his email address in the system since the beginning of the case. To further substantiate this finding, Greg Hughes and I experimented in our test data base to ascertain whether once an email has been changed whether it would change prior records. Our conclusion was that it did not. (See attached. test data base example for CA 03-3030).

Finally, at your request, I examined the bounced emails for May 9, 2006, (# 15 Order denying without prejudice motion to dismiss; granting motion to amend) and July 3, 2006 (Minute Order). There were no bounced emails for these dates relating [*47] to this case for either counsel.

# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ANSELL HEALTHCARE
PRODUCTS LLC,

                  Plaintiff,

    v.

TILLOTSON CORPORATION,

                  Defendant.

Civil Action No. _____

## **COMPLAINT**

### **The Parties**

1.      Plaintiff Ansell Healthcare Products LLC ("Ansell") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business in Red Bank, New Jersey.

2.      On information and belief, defendant Tillotson Corporation ("Tillotson") is a Massachusetts corporation with a principal place of business in Massachusetts located at One Cranberry Hill, Suite 105, Lexington, Massachusetts.

### **Jurisdiction and Venue**

3.      This action arises under the patent laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Count I
### (Claim For Declaratory Judgment)

5.    On information and belief, Tillotson is the assignee and present owner of United States Reissue Patent No. Re 35,616 ("the '616 patent"). A true and correct copy of the '616 patent is attached hereto as Exhibit A.

6.    Ansell sells and offers for sale within the United States, including this District, elastomeric hand gloves, including Micro-Touch® Nitrile medical examination gloves.

7.    Tillotson has sued Ansell's customer Darby Dental Supply Co., Inc. ("Darby Dental") in the United States District Court for the Northern District of Georgia, alleging that Darby Dental has sold and/or offered for sale gloves made from elastomeric materials that infringe one or more claims of the '616 patent.

8.    In June 2006, Tillotson's counsel advised Darby Dental's counsel that one line of gloves sold by Darby Dental that Tillotson contended infringed the '616 patent was Ansell's Micro-Touch® Nitrile medical examination gloves.    That information was communicated to Ansell on July 27, 2006.

9.    Ansell has asked Tillotson's counsel on several occasions whether Tillotson intends to assert a claim against Ansell in the Georgia action and has received ambiguous responses. Tillotson has also declined Ansell's request to dismiss without prejudice the claim against Darby Dental for infringement of the '616 patent based on Ansell gloves.

10.    Tillotson has over a number of years filed more than 15 separate actions alleging infringement of the '616 patent by manufacturers and sellers of nitrile gloves.

11.    Tillotson's statements, allegations and actions have created a reasonable apprehension and belief on the part of Ansell that it will soon be faced with a patent infringement

lawsuit as a result of the sale and offer for sale in the United States of its Micro-Touch® Nitrile

medical examination gloves which Tillotson contends infringe the '616 patent.

12.     Ansell has not infringed, and is not now infringing, any valid and

enforceable claim of the '616 patent.

13.     Tillotson's "customer suit" against Darby Dental places a cloud over

Ansell's ability to market its Micro-Touch® Nitrile medical examination gloves in the United

States and in this District.

14.     A justiciable controversy exists between Ansell and Tillotson with respect

to the '616 patent.

WHEREFORE, Ansell prays for judgment as follows:

(a)     For a judicial determination and declaration that Ansell has not infringed, induced others to infringe, or contributed to the infringement of any valid claim of the '616 patent;

(b)     For an injunction prohibiting Tillotson, its officers, agents, servants and employees, and all persons in active concert or participation with any of them, from alleging infringement of, or instituting or pursuing any action for alleged infringement of, the '616 patent against Ansell or its customers with respect to any glove sold or offered for sale by Ansell; and

(c)     For such other and further relief as the Court deems just and equitable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

DATE: August 25, 2006

Jack B. Blumenfeld (#1014)
1201 N. Market Street
P. O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200

OF COUNSEL:
Thomas B. Kenworthy
David W. Marston Jr. (#3972)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000

*Attorneys for Plaintiff*
*Ansell Healthcare Products LLC*

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANSELL PROTECTIVE
PRODUCTS INC.,

                    Plaintiff,

    v.                                        Civil Action No. _____

TILLOTSON CORPORATION,

                    Defendant.

## COMPLAINT

### The Parties

1.     Plaintiff Ansell Protective Products Inc. ("Ansell Protective Products") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Red Bank, New Jersey.

2.     On information and belief, defendant Tillotson Corporation ("Tillotson") is a Massachusetts corporation with a principal place of business in Massachusetts, located at One Cranberry Hill, Suite 105, Lexington, Massachusetts.

### Jurisdiction and Venue

3.     This action arises under the patent laws of the United States.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Count I
### (Claim For Declaratory Judgment)

5.      On information and belief, Tillotson is the assignee and present owner of United States Reissue Patent No. Re 35,616 ("the '616 patent"). A true and correct copy of the '616 patent is attached hereto as Exhibit A.

6.      Ansell Protective Products sells and offers for sale within the United States, including this District, elastomeric hand gloves, including Touch N Tuff and TNT gloves.

7.      Tillotson has over a number of years filed more than 15 separate actions alleging infringement of the '616 patent by manufacturers and sellers of nitrile gloves.

8.      In an action pending in this Court, Tillotson has accused Ansell Protective Products' sister company, Ansell Healthcare Products LLC ("Ansell Healthcare"), of infringing the '616 patent with respect to Touch N Tuff and TNT gloves. It is Ansell Protective Products rather than Ansell Healthcare, however, that sells these gloves.

9.      Tillotson's statements, allegations and actions have created a reasonable apprehension and belief on the part of Ansell Protective Products that it will soon be faced with a patent infringement lawsuit as a result of the sale and offer for sale in the United States of its Touch N Tuff and TNT gloves, which Tillotson contends infringe the '616 patent.

10.      Ansell Protective Products has not infringed, and is not now infringing, any valid and enforceable claim of the '616 patent.

11.      A justiciable controversy exists between Ansell Protective Products and Tillotson with respect to the '616 patent.

WHEREFORE, Ansell Protective Products prays for judgment as follows:

(a)    For a judicial determination and declaration that Ansell Protective Products has not infringed, induced others to infringe, or contributed to the infringement of any valid claim of the '616 patent;

(b)    For an injunction prohibiting Tillotson, its officers, agents, servants and employees, and all persons in active concert or participation with any of them, from alleging infringement of, or instituting or pursuing any action for alleged infringement of, the '616 patent against Ansell Protective Products or its customers with respect to any glove sold or offered for sale by Ansell Protective Products; and

(c)    For such other and further relief as the Court deems just and equitable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Date:  February 20, 2007

_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P. O. Box 1347
Wilmington, Delaware  19899
jblumenfeld@mnat.com
(302) 658-9200

*Of Counsel*:                               *Attorneys for Plaintiff*
                                            *Ansell Protective Products Inc.*

Thomas B. Kenworthy
David W. Marston Jr.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5000

741890.1

3

# EXHIBIT A

US00RE35616E

## United States Patent [19]

Tillotson et al.

[11] E    Patent Number:    Re. 35,616

[45] Reissued    Date of Patent:    Sep. 30, 1997

[54] **ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH**

[75] Inventors: Neil E. Tillotson, Dixville Notch, N.H.; Luc G. DeBecker, Vancleave, Miss.

[73] Assignee: Tillotson Corporation, Boston, Mass.

[21] Appl. No.: 556,080

[22] Filed: Nov. 13, 1995

**Related U.S. Patent Documents**

Reissue of:
[64] Patent No.: 5,014,362
   Issued: May 14, 1991
   Appl. No.: 522,390
   Filed: May 11, 1990

[51] Int. Cl.[6] .................................................. A41D 19/00
[52] U.S. Cl. ........................................ 2/168; 2/167
[58] Field of Search ................... 2/168, 161.7, 167, 2/169, 161.6, 159, 163, 164; 524/430, 432, 433, 434, 436; 526/338

[56]    **References Cited**

U.S. PATENT DOCUMENTS

2,577,345  12/1951  McEwen ........................ 128/294

| | | | |
|---|---|---|---|
| 2,880,189 | 3/1959 | Miller | 260/29.7 |
| 3,759,254 | 9/1973 | Clark | 128/79 |
| 4,096,135 | 6/1978 | Ohishi et al. | 260/79.5 B |
| 4,115,873 | 9/1978 | Stansbury | 2/163 |
| 4,508,867 | 4/1985 | Sato | 524/434 |
| 4,590,123 | 5/1986 | Hashimoto et al. | 428/316.6 |
| 4,684,490 | 8/1987 | Taller et al. | 264/296 |
| 4,834,114 | 5/1989 | Boarman | 128/830 |
| 4,855,169 | 8/1989 | McGlothlin et al. | 428/35.2 |
| 4,945,923 | 8/1990 | Evans et al. | 128/842 |
| 4,963,623 | 10/1990 | Miller et al. | 525/604 |
| 4,971,071 | 11/1990 | Johnson | 128/842 |

FOREIGN PATENT DOCUMENTS

59-124831  7/1984  Japan .

Primary Examiner—Amy B. Vanatta
Attorney, Agent, or Firm—Jones & Askew

[57]    **ABSTRACT**

An elastomeric material and gloves made therewith are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and have a relatively low resilience. The gloves conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced. The gloves are particularly useful in medical applications and most particularly useful as surgical gloves.

21 Claims, 1 Drawing Sheet



**U.S. Patent**          Sep. 30, 1997          **Re. 35,616**



*FIG 1*



*FIG 2*

Re. 35,616

# 1

## ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH

*Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.*

### TECHNICAL FIELD

The present invention generally relates to elastomeric materials, and more particularly relates to flexible latex gloves useful in medical applications.

### BACKGROUND OF THE INVENTION

Coverings made with elastomeric materials are well known and find many useful applications. One such application is known as the "latex glove." Latex gloves are made from a variety of elastomers and during the glove-making process the elastomers are normally in their latex form. Latex gloves are often desirable because they can be made light, thin, flexible, tightly-fitting and substantially impermeable to some liquids and gases such as liquid water and water vapor.

The characteristics of latex make latex gloves useful in medical applications, and particularly useful as surgical gloves. Surgeons are required to perform delicate operations with their hands while wearing latex gloves. Surgical operations often last for hours. To maintain accurate control over instruments with their hands, surgeons must wear relatively thin latex gloves which fit closely to their skin so that they can grip and feel the instruments in their hand almost as if they were not wearing gloves at all. Thus, conventional latex surgical gloves are thin and undersized so as to fit tightly onto the surgeons' hands. However, conventional latex surgical gloves, which are often made of natural rubber, are very resilient and, when stretched to fit about the wearer's hand, apply pressure to the wearer's hand. With conventional latex surgical gloves, this pressure is not appreciably released until the wearer removes the gloves. The pressure applied by conventional latex surgical gloves restricts the blood vessels in the hands of the wearer and restricts the movement of the wearer's fingers. Thus, when worn for an extended period of time, the pressure applied by conventional latex surgical gloves tends to numb and fatigue the wearer's hands and causes general discomfort for the wearer. During a long surgical operation, this can cause surgeons some difficulty in controlling instruments with their hands.

Accordingly, there is a need for an elastomeric material which is suitable as a covering, but which relaxes after being stretched about an object. More particularly, there is a need for a latex surgical glove that, when stretched to fit the wearer's hand, conforms to fit closely about the wearer's hand and then relaxes to relieve the pressure applied by the glove to the wearer's hands and give the wearer greater comfort and greater sensitivity in performing delicate tasks.

### SUMMARY OF THE INVENTION

Accordingly, an object of the present invention is to provide an improved latex glove.

Another object of the present invention is to provide a latex glove which does not numb or fatigue the hand of the wearer when worn for an extended period of time.

Another object of the present invention is to provide a latex glove which conforms to the wearer's hand, but does not exert pressure on the wearer's hand for an extended period of time.

# 2

A further object of the present invention is to provide an elastomeric material useful in forming a covering or glove than when stretched to cover an object conforms to the shape of the object and then relaxes to reduce the pressure exerted upon the object.

This invention fulfills these and other objects by providing an elastomeric material characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low level of resilience. More specifically, the elastomeric material of the present invention is characterized by having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and having elastic properties such that when the elastomeric material is stretched from an initial configuration to fit about an object, the elastomeric material conforms to the configuration of the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% of the predetermined pressure.

Preferably, the material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in the amount effective to impart sufficient tensile strength without significantly stiffening the elastomeric material and altering the elastomeric properties. More preferably, the material of the present invention comprises carboxylated nitrile butadiene rubber.

The metallic compound preferably comprises a metal selected from the group consisting of lead, magnesium and zinc. More preferably, the metallic compound is a metallic oxide. Preferred metallic oxides include lead oxide, magnesium oxide and zinc oxide. Zinc oxide is the most preferred metallic compound. Zinc oxide is preferably present in the material in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

According to another aspect, the present invention comprehends a glove comprising a layer of the elastomeric material of the present invention. The glove of the present invention has an initial configuration adapted to receive a hand. Because the glove of the present invention comprises a layer of the elastomeric material of the present invention, the glove of the present invention has elastic properties such that when stretched from the initial configuration to fit about a hand, the glove conforms to the configuration of the hand initially exerting a predetermined pressure on the hand and thereafter relaxing to exert on the hand a reduced pressure which is substantially less than about 80% of the predetermined pressure. In addition, the glove of the present invention has a relatively high tensile strength and is substantially impermeable to water vapor and liquid water. Accordingly, the glove of the present invention is particularly useful as a surgical glove. After being donned by the wearer, the glove of the present invention relaxes so that the pressure on the wearer's hand is substantially reduced, but remains closely fitted about the wearer's hand. Thus, the glove of the present invention may be worn for an extended period of time without diminishing the sensitivity of the wearer's hand or becoming uncomfortable.

Other features, objects, and advantages of the present invention will become apparent from the following detailed description, drawings, and claims.

### BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a graph comparing the percent of initial stress required to maintain the stretch of a latex glove made

Re. 35,616

3

according to a preferred embodiment of the present invention to that required by a conventional latex glove.

FIG. 2 is a graph comparing the stress required to maintain the stretch of a latex glove mile according to a preferred embodiment of the present invention to that required by a conventional latex glove.

## DETAILED DESCRIPTION

Generally described, the elastomeric material of the present invention is characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low resilience. These properties make the elastomeric material of the present invention particularly useful as a covering, and even more particularly useful as a glove.

The elastomeric material of the present invention has the following properties as measured according to ASTM D-412 on a sample having a thickness from about 4.0 to about 4.5 mils: a tensile strength greater than about 1500 psi and preferably greater than about 2000 psi, and a elongation greater than about 700% and preferably greater than about 800%, and a 500% modulus less than about 350 psi and preferably between about 250 and about 300 psi. The tensile strength is the energy required to stretch the sample to the breaking point and the elongation is the percent stretch of the sample at the breaking point. The 500% modulus is a measure of the energy it takes to stretch the sample 500% of a predetermined length. The elastomeric material of the present invention and gloves made therewith also have a high level of puncture resistance. The elastomeric material of the present invention has a puncture resistance as measured according to ASTM D-120 on a sample having a thickness between about 4.0 and 4.5 mils of greater than about 800 pounds per inch.

The high level of strength as illustrated by the foregoing properties, enables the elastomeric material of the present invention and gloves made therewith to be pulled and stretched a considerable amount before breaking. Thus, a glove made with the elastomeric material of the present invention can be made to fit closely to the wearer's skin because it can be pulled with a considerable amount of force when being donned by the wearer. This is particularly important for surgical gloves which must be thin and fit closely.

The relatively low resilience, allows the elastomeric material of the present invention and gloves made therewith to relax after being stretched while the stretch is maintained. In other words, the elastomeric material of the present invention has elastic properties such than when the elastomeric material is stretched from an initial configuration to fit about an object such as a hand, the elastomeric material conforms to the configuration or the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% or the predetermined pressure. Preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastic properties such that the significantly reduced pressure is reached within six minutes after the material is stretched to fit about the object or hand. More preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than about 50% of said predetermined pressure within about one minute after the material is stretched to fit about the object or hand. Most preferably, the elastomeric

4

material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than [bout 90%] *about 10%* of said predetermined pressure within about six minutes after the material is stretched to fit about the object or hand.

Accordingly, gloves made with the elastomeric material of the present invention are particularly useful as surgical gloves because they relax on the hands of the wearer after being donned so that there is little resistance to movement by the wearer's fingers and there is little restriction of blood vessels in the wearer's hands. Thus, gloves made with the elastomeric material of the present invention can be worn for extended periods of time without tiring or numbing the hands of the wearer, thereby giving the wearer greater comfort and greater sensitivity in performing delicate tasks. The elastic properties of the gloves of the present invention are illustrated in FIGS. 1 and 2 discussed hereinbelow.

Preferably, the elastomeric material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in an amount effective to impart sufficient tensile strength to the elastomeric material without significantly stiffening elastomeric material and altering the elastic properties of the elastomeric material. The nitrile butadiene rubber is preferably carboxylated nitrile butadiene rubber which when cured possesses a higher tensile strength than noncarboxylated nitrile butadiene rubber.

The metallic compound preferably comprises lead, magnesium or zinc. Representative compounds are metallic oxides, such as lead oxide, magnesium oxide or zinc oxide. Zinc oxide is preferred. In addition, zinc oxide is preferably present in the elastomeric material in an amount from about 0.1 to about 0.5 parts per hundred parts nitrile butadiene rubber. If the zinc oxide is not present or is, present in an amount below this range, the tensile strength of the elastomeric material is reduced and gloves made therewith tear easily. If the zinc oxide is present in an amount above this range, the elastomeric material and gloves made therewith become more stiff and their resilience is reduced. At the higher resilience, gloves made with the elastomeric material maintain undesirable pressure on the hands of the wearer.

The gloves of the present invention are preferably made by dipping a glove form into a latex mixture, curing the latex mixture on the glove form at elevated temperatures, and then stripping the cured latex glove from the glove form. The resulting gloves preferably have a thickness from about 4.0 to about 4.5 mils.

The latex mixture preferably comprises carboxylated nitrile butadiene rubber latex having about a 40% dry rubber content and zinc oxide in the amount from about 0.1 to about 0.5 parts per hundred parts rubber. The latex mixture may also include additives commonly used to make cured latex products such as processing agents, pH control agents, accelerating agents, curing agents, coagulants, and colorants. As will be appreciated by those skilled in the art, the amounts of these additives may be varied considerably. This preferred latex mixture is preferably cured in an oven for 30 to 40 minutes at 270 to 300 degrees Fahrenheit.

The present invention is further illustrated by the following example which is designed to teach those of ordinary skill in the art how to practice this invention and represent the best mode contemplated for carrying out this invention.

## EXAMPLE 1

Latex gloves were made as follows. A latex material having the formula set forth in Table 1 was thoroughly

Re. 35,616

<div style="columns:2">

**5**

mixed in a container. The amount of each component of the material is set forth in parts per hundred dry rubber (PHR). Table 1 shows the amount of dry carboxylated nitrile butadiene rubber present in the latex composition; however, the carboxylated nitrile butadiene rubber was added to the latex composition as a latex comprising 40% by weight of carboxylated nitrile butadiene rubber with the remainder water and surfactants. The sodium dodecylbenzene sulfonate is a processing agent, the potassium hydroxide is present as a pH control agent, the sulfur is a curing agent, the zinc dibutyl dithiocarbamate is an accelerating agent, the titanium dioxide is present as a pigment, the MICHEMLUBE 135 is a paraffin wax emulsion available from Michelman, Inc., Cincinnati, Ohio, and the COAGULANT WS is a polyether-polysiloxane coagulant available from Bayer, Inc.

Glove forms were prepared by washing with a detergent and rinsing. The glove forms were then dipped in a coagulant mixture comprising calcium nitrate, water and a non-ionic soap to promote congealing of the latex around the glove forms. After being dipped in the coagulant mixture, the glove forms were dipped in the latex material. The latex coated glove forms were then dipped in a leach consisting of warm water and then into a powder slurry consisting of powdered starch. The latex coated glove forms were then placed in an oven for 30 minutes at 285 degrees Fahrenheit to cure the latex. After removal from the oven, the cured latex coated glove forms were dipped in a post curing leach consisting of warm water. The cured latex gloves were then stripped from the glove forms and tumbled.

TABLE 1

EXAMPLE 1 LATEX FORMULATION

|  | PHR |
|---|---|
| Carboxylated nitrile butadiene rubber (dry) | 100.0 |
| Sodium dodecylbenzene sulfonate | 0.25 |
| Potassium hydroxide | 0.7 |
| Sulfur | 1.0 |
| Zinc dibutyl dithiocarbamate | 1.0 |
| Zinc oxide | 0.5 |
| Titanium dioxide | 4.0 |
| MICHEMLUBE 135 | 3.0 |
| COAGULANT WS | 2.0 |
| STAN-TONE WD 2467 pigment | 0.1 |
| CHERRY FLAVOR #50767 pigment | 0.7 |

The gloves from Example 1 were subjected to a series of tests, the results of which are shown in Tables 2 and 3 and FIGS. 1 and 2. The tensile strength, elongation, and 500% modulus of the gloves made according to Example 1 were each measured according to ASTM D-412 and are shown in Table 2.

TABLE 2

| Physical Properties-ASTM D-412 |  |
|---|---|
| Thickness | 4.5 mils |
| Tensile Strength | 2200 psi |
| Elongation | >800% |
| 500% modulus | 350 psi |

The puncture resistances of the gloves from Example 1, of a conventional natural rubber latex examination glove, and of a conventional natural rubber latex surgical glove were measured according to ASTM D-120 and the results are shown in Table 3. Table 3 illustrates the superior puncture resistance of the gloves made according to Example 1.

**6**

TABLE 3

| PUNCTURE RESISTANCE-ASTM D-120 |  |  |  |
|---|---|---|---|
| Glove | lbs. | gauge | lbs./inch |
| NR examination | 1.9 | 6.7 | 281 |
| NR surgical | 2.9 | 7.5 | 396 |
| Example 1 | 3.9 | 4.7 | 842 |

The resilience of the gloves made according to Example 1 and a conventional natural rubber latex glove was tested as follows. A sample was cut from each glove and stretched 100% of its length to determine the initial 100% modulus according to ASTM D-412. The amount of stress required to maintain this 100% stretch was then recorded every minute for 30 minutes. The resulting data is shown in FIGS. 1 and 2. FIG. 1 is a plot of percent of initial stress versus time for the sample from the Example 1 glove and the sample from the conventional natural rubber glove. FIG. 2 is a plot of stress in psi versus time for the same samples. As can be seen from FIGS. 1 and 2, the stress required to maintain the 100% stretch of the Example 1 glove sample was substantially zero within six minutes after the initial stretch, while the stress required to maintain the 100% stretch of the conventional glove sample dropped to only about 80% of the initial stress over the 30 minute period.

The foregoing description relates only to preferred embodiments of the present invention, and numerous changes and modifications may be made therein without departing from the spirit and scope of the invention as defined in the following claims.

What is claimed is:

1. A closely fitting glove comprising a layer of elastomeric material (a) comprising nitrile butadiene rubber, (b) having an initial configuration adapted to receive and fit closely about a hand, and (c) characterized by (i) being substantially impermeable to water vapor and liquid water, (ii) having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and (iii) having a thickness and elastic properties such that the glove is capable of being stretched to fit closely about the hand and when stretched from the initial configuration to fit closely about the hand, the elastomeric material conforms to the configuration of the hand, initially exerting [a predetermined] an initial pressure on the hand and thereafter still fitting closely about the hand, but relaxing, within about 6 minutes after the glove is stretched to fit about said hand, to exert on the hand a reduced pressure which is [substantially] less than about [80%] 50% of the [predetermined] initial pressure.

2. A glove as in claim 1, wherein the layer of elastomeric material further comprises [nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening the elastomeric material and altering said elastic properties.

3. A glove as in claim 2 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

4. A glove as in claim 2 wherein the metallic compound comprises metallic oxide.

5. A glove as in claim 4 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

6. A glove as in claim 2 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

</div>

Re. 35,616

<table>
<tr><td>7</td><td>8</td></tr>
</table>

7. A glove as in claim 1, wherein the *nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber and the layer of elastomeric material further comprises* [carboxylated nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening said elastomeric material and said elastic properties.

8. A glove as in claim 7 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

9. A glove as in claim 7 wherein the metallic compound comprises metallic oxide.

10. A glove as in claim 9 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

11. A glove as in claim 7 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

[12. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within 6 minutes after the glove is stretched to fit about said hand.]

[13. A glove as in claim 1, further characterized by having elastomeric properties such that the reduced pressure is less than about 50% of said predetermined pressure.]

14. A glove as in claim [13] *1* further characterized by having elastic properties such that said reduced pressure is reached within about one minute after the glove is stretched to fit about said hand.

15. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties

such that said reduced pressure is less than about [90%] *10%* of said [predetermined] *initial* pressure.

[16. A glove as in claim 15, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within about 6 minutes after the material is stretched to fit about said hand.]

*17. A glove as in claim 1, wherein the layer of elastomeric material has a thickness up to about 4.5 mils.*

*18. A glove as in claim 1, wherein the layer of elastomeric material has a thickness from about 4 to about 4.5 mils.*

*19. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a puncture resistance of greater than about 800 lbs/in.*

*20. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having an elongation of greater than about 800%.*

*21. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus up to about 350 psi.*

*22. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus in the range from about 250 to about 350 psi.*

*23. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastomeric properties such that said reduced pressure is about zero.*

*24. A glove as in claim 1, wherein the nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber.*

*   *   *   *   *